[Cite as *State v. Flowers*, 2012-Ohio-3783.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | | C.A. No. 25841 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| DAVID J. FLOWERS | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 10 08 2283 |

DECISION AND JOURNAL ENTRY

Dated: August 22, 2012

CARR, Judge.

{¶1} Appellant, David Flowers, appeals the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} This case arises out of the arrest of David Flowers on August 12, 2010, after he was involved in a violent confrontation with his girlfriend.

{¶3} On August 26, 2010, the Summit County Grand Jury indicted Flowers on one count of felonious assault, two counts of possession of cocaine, two counts of trafficking in cocaine, four counts of domestic violence, and one count of violating a protection order. Both counts of possession of cocaine contained forfeiture specifications. On September 16, 2010, a supplemental indictment was filed adding a repeat violent offender specification to the felonious assault charge. On October 27, 2010, a second supplemental indictment was filed charging

Flowers with one count of kidnapping with a repeat violent offender specification. Flowers pleaded not guilty to the aforementioned charges and the case proceeded to jury trial.

{¶4} Prior to the commencement of trial, the State moved to dismiss two of the domestic violence counts contained in the original indictment, as well as the count of violating a protection order. The trial court granted the motion. Also prior to trial, Flowers moved to bifurcate the consideration of the repeat violent offender specification attached to the felonious assault charge, to allow the trial court, rather than the jury, to determine whether Flowers was a repeat violent offender. The trial court granted this motion as well. The jury subsequently found Flowers guilty of felonious assault, two counts of possession of cocaine, two counts of trafficking in cocaine, and one count of domestic violence. After the hearing, the trial court found that Flowers was a repeat violent offender. The trial court declined to sentence Flowers on the domestic violence charge as the court found that said charge merged with the felonious assault charge. The trial court further found that the two counts of possession of cocaine merged with the two counts of trafficking in cocaine. The trial court sentenced Flowers to a total of 13 years imprisonment. Flowers was further ordered to forfeit $111. The sentencing entry was issued on February 7, 2011.

{¶5} Flowers has appealed. Flowers initially filed a brief raising four assignments of error. Flowers subsequently filed a motion to amend his brief and withdraw his fourth assignment of error. The motion is granted at this time.

II.

**ASSIGNMENT OF ERROR I**

FLOWERS' CONVICTIONS SHOULD BE REVERSED BECAUSE HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO MOVE THE COURT TO SUPPRESS A STATEMENT FLOWERS MADE IN RESPONSE TO A POLICE QUESTION AFTER

FLOWERS WAS IN CUSTODY, BUT BEFORE HE WAS GIVEN HIS MIRANDA RIGHTS.

{¶6} In his first assignment of error, Flowers argues that trial counsel rendered ineffective assistance of counsel by not moving to suppress a statement Flowers made to police after he was taken into custody. This Court disagrees.

{¶7} In support of his first assignment of error, Flowers argues that trial counsel should have filed a motion to suppress statements he made to police officers before he was *Mirandized*. Flowers argues that, after he had been taken into custody, the arresting officer asked him a question that could have been expected to elicit an incriminating response. Specifically, Officer Mallard asked Flowers if the room in which he was arrested was his room. Flowers answered this question in the affirmative. Flowers argues that his statement was highly prejudicial because it linked him to the contents of the room, which included drugs and cash. In his merit brief, Flowers argued, "Granted, the statement was admissible under the Rules of Evidence as an admission by a party opponent, see Evid.R. 801(D)(2), but that does not mean that Flowers' un-*Mirandized* statement ought not to have been suppressed or stricken as a violation of his Constitutional rights."

{¶8} In order to prevail on a claim of ineffective assistance of counsel, Flowers must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Thus, a two-prong test is necessary to examine such claims. First, Flowers must show that counsel's performance was objectively deficient by producing

evidence that counsel acted unreasonably. *State v. Keith*, 79 Ohio St.3d 514, 534 (1997), citing *Strickland*, 466 U.S. at 687. Second, Flowers must demonstrate that but for counsel's errors, there is a reasonable probability that the results of the trial would have been different. *Keith*, 79 Ohio St.3d at 534. If a defendant fails to satisfy either prong of the *Strickland* test, his claim of ineffective assistance of counsel must fail and the court need not address the other prong. *Strickland*, 466 U.S. at 688.

{¶9} "[T]he failure to file a motion to suppress which possibly could have been granted and implicated matters critical to the defense can constitute ineffective assistance of counsel, if such failure prejudices the defendant." *State v. Pitts*, 9th Dist. No. 20976, 2002-Ohio-6291, ¶ 88. In order to demonstrate that trial counsel's performance was deficient, a defendant must establish that a valid basis existed to suppress the evidence. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 35.

{¶10} As noted above, this case arises of out a dispute between Flowers and his girlfriend, Erica Elmore. Elmore testified that she and Flowers began dating in the summer of 2009. By July 2010, the couple was staying in a house located at 910 Bye Street in Akron. Flowers and Elmore were living with Flowers' brother, Mickey Fry, who owned the home. On July 2, 2010, Elmore reported to police that Flowers had punched her in the face. Elmore testified that the dispute occurred because Flowers accused her of stealing drugs. Within two weeks of the incident, Elmore and Flowers had reconciled to the extent that they continued living together at the Bye Street house. Elmore testified that while she and Flowers were drinking with Mickey Fry at the house on August 11, 2010, Flowers assaulted her again. Flowers had become angry when Elmore called her mom to ask if she could come pick her up and take her home. Elmore testified that Flowers knocked the phone out of her hand and proceeded to drag her

outside. Elmore further testified that Flowers hit and choked her, and bit her fingers and face. Flowers would not allow Elmore to leave and he assaulted her multiple times over the course of several hours. When Flowers fell asleep on the morning of August 12, 2010, Elmore took his phone, left the house, and called 911. Elmore ran to the corner of Peckham St. and Madison Ave. where she met the police and EMS. Before she was transported to the hospital by EMS, Elmore told police that Flowers was in the house on Bye Street.

{¶11} Before she was transported to the hospital, Elmore spoke with Officer Marlon Mallard of the Akron Police Department. Officer Mallard testified it was clear that Elmore had sustained injuries. Elmore indicated that she wanted to press charges and she filled out a victim impact statement. Elmore told the officers that Flowers was living at the house at 910 Bye Street. Officer Mallard then drove to the house with Officer Looney. When Officer Mallard knocked loudly on the front door, he did not receive a response. He then met Officer Looney on the side of the house where they found the side door to be "unlocked and slightly open." The officers announced themselves as the Akron Police and again did not receive a response. The officers then entered the house, continuing to announce their presence. Officer Mallard heard "some rustling upstairs." Mickey Fry then came down the stairs and stated that he lived in the house. The officers asked whether Flowers was in the house. When Fry stated that Flowers was not home, Officer Mallard asked if he and Officer Looney could look upstairs. Fry granted the officers permission and accompanied them up the steps.

{¶12} The officers arrived on the second floor to find three bedrooms. When Officer Mallard went into the first room, he saw money scattered on the floor along with plastic packaging containing a white substance. Officer Mallard testified the white substance appeared to be cocaine packaged for sale. Officer Mallard exited the first bedroom to find that Officer

Looney had finished checking the second bedroom. As the officers turned their attention to the third bedroom, they noticed that the door was closed. Officer Mallard asked Fry about the room and Fry indicated that it was his bedroom. Officer Mallard entered the third bedroom and found Flowers hiding in the closet. Officer Mallard then took Flowers into custody. At trial, Officer Mallard was asked if Flowers made any statements or utterances when he was taken into custody. Officer Mallard replied, "I asked him whether or not the room that I found all the drugs in -- I said – I asked him whether or not that was his room. And he said yes. And that was while we were walking to my cruiser." Officer Mallard placed Flowers in the cruiser and then assisted in photographing the bedroom where the drugs and money were discovered. Officer Mallard then drove Flowers to the police station, where he read Flowers his *Miranda* rights. During the ensuing interrogation, Officer Mallard asked Flowers about the cocaine that had been found in the bedroom. Flowers responded by saying that the cocaine did not belong to his brother.

{¶13} Several photographs of the bedroom containing the drugs and money were introduced as exhibits at trial. Elmore testified that she and Flowers shared the room together. Elmore further testified that the money and drugs found in the room belonged to Flowers. Elmore indicated that Flowers had the drugs because he sold them. Portions of Flowers' jail calls were also played at trial. During one call, Flowers states "They went in my room and seen little items and picked them up too. Ah man, that made me look so bad."

{¶14} Flowers testified in his own defense at trial. Flowers testified that he did not own the drugs discovered in the bedroom and he did not know how they got there. While Flowers denied that the drugs were present in the room on morning of the day he was arrested, he admitted to sleeping with Elmore in the room where the drugs were found.

{¶15} A review of the trial transcript reveals that the result of the trial would not have been different had defense counsel filed a motion to suppress Flowers' statement to Officer Mallard, as independent evidence was presented which linked Flowers to the bedroom in question. Elmore testified that she and Flowers shared the room where the drugs were found, and that the drugs in the room belonged to Flowers. After Flowers had been informed of his *Miranda* rights, he told Officer Mallard that the drugs did not belong to his brother. Flowers himself testified that he had slept with Elmore in the room where the drugs were found. In light of this evidence, Flowers cannot prevail on his argument that but for the admission of his statement to Officer Mallard, the outcome of trial would have been different. Flowers' first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

FLOWERS WAS DENIED HIS CONSTITUTIONAL RIGHTS WHEN THE TRIAL COURT ALLOWED INADMISSIBLE HEARSAY TO BE ADMITTED IN FLOWERS' TRIAL.

{¶16} In his second assignment of error, Flowers argues that the trial court erred in allowing inadmissible hearsay. This Court disagrees.

{¶17} In his merit brief, Flowers argues that the trial court admitted hearsay on multiple occasions over the objection of defense counsel. Specifically, Flowers argues that even after Erica Elmore testified that Flowers had assaulted and injured her, the trial court allowed her mother, Nina Elmore, to offer cumulative testimony about her daughter's injuries. Flowers also argues the trial court should not have permitted the State to elicit testimony regarding Elmore's injuries from Officer Mallard, Dr. Jno Disch, the emergency room physician who treated Elmore, and Dennis Shumaker, the paramedic who first treated Elmore. Flowers further contends that Officer Mallard should not have been permitted to testify regarding the contents of court records.

Flowers asserts that these statements, "even if they were not hearsay, were more than cumulative and repetitive; they were gratuitous and unnecessary." Finally, Flowers argues that the State should not have been permitted to introduce into evidence Shumaker's "run report" and Elmore's emergency room records, both of which contained hearsay statements.

{¶18} Evid.R. 801(C) defines "hearsay" as "a statement, other than made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." As a general rule, hearsay is not admissible. Evid.R. 802. The hearsay rule does not apply, however, when an out-of-court statement is offered for a purpose other than the truth of the matter asserted. *State v. Lewis*, 22 Ohio St.2d 125, 132 (1970).

**Excited Utterances**

{¶19} Evid.R 803 provides numerous exceptions to the hearsay rule. Evid.R. 803(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "To be admissible under Evid.R 803(2) as an excited utterance, a statement must concern 'some occurrence startling enough to produce a nervous excitement in the declarant,' which occurrence the declarant had an opportunity to observe, and must be made 'before there had been time for such nervous excitement to lose a domination over his reflective faculties. * * *'" *State v. Huertas*, 51 Ohio St.3d 22, 31 (1990), quoting *Potter v. Baker*, 162 Ohio St. 488 (1955), paragraph two of the syllabus. Admitting a declaration as an excited utterance is not prohibited by questioning which: "(1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." *State v. Wallace*, 37 Ohio St.3d 87, 93 (1988).

**{¶20}** At trial, Nina Elmore testified regarding a phone call she received from her daughter on July 2, 2010. Nina testified that Erica was upset and that she was not speaking in her normal voice. Erica's voice was "shaky" and she was crying. During the call, Erica indicated that she and Flowers had been fighting. Nina got upset and offered to give Erica a ride. Nina then traveled with her father to pick up Erica. When they arrived, Nina observed that Erica had bruises under her eye and that her cheeks were red. Later that summer, Nina received another call from Erica. Erica was crying and sounded upset. Erica again asked her mother to give her a ride. Nina then heard "thumping around" and she heard Erica "screaming" and "hollering." Nina testified that she heard Erica screaming "[h]elp, help, help." Nina testified that upon hearing these statements, she was in a state of panic. These statements were excited utterances and admissible under Evid.R. 803(2). On both occasions, Erica was in a state of duress because she was in the midst of a violent altercation. Nina testified that Erica's voice suggested that she was startled and in a state of unrest. Moreover, in both instances, Erica indicated that she was hoping to escape each respective situation. Thus, Nina's testimony regarding the phone calls did not contain inadmissible hearsay. *See State v. Jackson*, 2d Dist. No 18881, 2002 WL 398655 (Mar. 15, 2002) (recognizing that exclamations made over the phone by a daughter to her mother that were made immediately after daughter had been punched in the mouth by her boyfriend at the supermarket were admissible under both the excited utterance and present sense impression exceptions to the hearsay rule).

**{¶21}** As noted above, Officer Mallard testified that he immediately noticed that Elmore had sustained visible injuries upon arriving at the corner of Peckham St. and Madison Ave. on August 12, 2012. Photographs taken at the scene showed that Elmore was experiencing significant swelling around her eyes and nose; that her face was bruised; that she had several

open wounds on her hands, and that she had suffered severe abrasions on her neck. Officer Mallard testified that when he encountered Elmore, she was "visibly upset" and "crying." When asked whether, as part of responding to the call, he asked Elmore what happened, Officer Mallard answered in the affirmative. Officer Mallard further testified that Elmore informed him that she suffered her injuries because her boyfriend had choked and bitten her. Assuming, arguendo, that Elmore's statement to Officer Mallard regarding the source of her injuries was offered for the truth of the matter asserted, it was admissible under the excited utterance exception. Elmore had run two blocks from the Bye Street house to the corner of Peckham and Madison in order to escape an attack that had lasted several hours. During the attack she had sustained significant injuries and was prevented from leaving. Under circumstances where it is apparent that a victim is "injured, bleeding, and emotionally distraught[,]" the victim's declaration will be admissible when it is not "the product of reflective thought." *Akron v. Hutton*, 9th Dist. No. 22425, 2005-Ohio-3300, ¶ 12. Here, the admission of Elmore's statement regarding the source of her injuries was proper given that it was made "while [she] was under the stress of excitement caused" by a startling event. Evid.R. 803(2); *State v. Campbell*, 9th Dist. No. 24688, 2010-Ohio-2573, ¶ 30.

**Public Records**

{¶22} Officer Mallard also testified as to the contents of certain court records involving Flowers. Specifically, Officer Mallard identified a journal entry indicating that Flowers had been convicted of domestic violence in 2005, and a complaint and journal entry indicating that Flowers had been convicted of domestic violence in 1999. The journal entries in question were generated by the Summit County Court of Common Pleas and the Akron Municipal Court,

respectively, and their contents were admissible pursuant to Evid.R. 803(8)(a) as public records. *State v. Gwen*, 9th Dist. No. 25218, 2011-Ohio-1512, ¶ 42.

## Statements for Purposes of Medical Diagnoses

{¶23} Another exception to the hearsay rule is set forth in Evid.R. 803(4), which states that a hearsay statement is admissible if the statement is "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inceptions or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." "[T]his Court has consistently held that a description of the encounter and even identification of the perpetrator are within the exception, as statements made for purposes of diagnosis or treatment." *State v. Stahl*, 9th Dist. No. 22261, 2005-Ohio-1137, ¶ 15, citing *State v. Eagle*, 9th Dist. No. 04CA0003, 2004-Ohio-3255, ¶ 16; *State v. Wade*, 9th Dist. No. 02CA0076-M, 2003-Ohio-2351, ¶ 6.

{¶24} Dr. Disch testified that part of his treatment of Erica Elmore in the emergency room after the August 11 incident involved obtaining a narrative of what caused her to need medical attention. Dr. Disch testified that he obtained this narrative for the purpose of "medical diagnosis and treatment." When Dr. Disch questioned Elmore regarding the source of her injuries, Elmore stated that her boyfriend had caused the injuries. Such an inquiry is particularly relevant when a patient has suffered a bite wound. This statement was clearly made for the purpose of medical diagnosis and was admissible pursuant to the hearsay exception set forth in Evid.R. 803(4).

{¶25} Dennis Shumaker testified that on August 12, 2010, he was working as a paramedic and was called to the corner of Peckham St. and Madison Ave in Akron. Upon

arriving, Shumaker immediately noticed that Elmore had blood on her shirt and had sustained injuries to her face. The "run report" that Shumaker drafted pursuant to the incident was introduced as an exhibit at trial. Shumaker testified that as part of the report, he obtained "for medical purposes" information about what happened to the injured individual. Shumaker testified that Elmore told him that she had been "punched, slapped, choked, [and] bitten" by her boyfriend. This statement was also admissible as a hearsay exception set forth in Evid.R. 803(4) because it was made for the purposes of diagnosis so that Elmore's injuries could be properly treated.

**Business Records**

{¶26} Evid.R. 803(6) governs the admissibility of business records as an exception to the hearsay rule. Evid.R. 803(6) specifically excludes:

> A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Medical records which are kept in the ordinary course of business may ordinarily be admitted at trial despite their hearsay status. *State v. Tolbert*, 9th Dist. No. 24958, 2010-Ohio-2864, ¶ 11-12.

{¶27} Shumaker's paramedic report, as well as a modified version of Elmore's emergency room records containing Dr. Disch's physician notes, were introduced as exhibits at trial. These records were created in the regular course of diagnosing and treating medical issues. As such, these documents were admissible pursuant to Evid.R. 803(6) as each constituted records of regularly conducted activity. While Flowers argues on appeal that these documents contained

hearsay-within-hearsay statements, he has not identified specific statements within the documents that he finds objectionable. As such, this Court "will not create an argument on his behalf." *In re G.E.S.*, 9th Dist. No. 23963, 2008-Ohio-2671, ¶ 53.

{¶28} We note that Flowers' assignment of error is framed in terms of the purported admission of hearsay evidence. To the extent that Flowers suggests in his brief that the trial court admitted cumulative evidence at trial, Flowers' argument is without merit as he has failed to demonstrate prejudice. In order to prevail on an argument made pursuant to Evid.R. 403(B), an appellant must demonstrate that he suffered prejudice because the probative value of a piece of evidence was outweighed by the needless presentation of cumulative evidence. Flowers has failed to demonstrate prejudice in this case because there was overwhelming evidence, including the testimony of Elmore herself, that Elmore suffered her injuries at the hands of Flowers.

{¶29} It follows that Flowers' second assignment of error is overruled.

**ASSIGNMENT OF ERROR III**

THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED FLOWERS
A FAIR TRIAL WHEN IT DENIED FLOWERS' REPEATED MOTIONS FOR
A MISTRIAL.

{¶30} In his third assignment of error, Flowers argues that the trial court abused its discretion when it denied his motions for a mistrial. This Court disagrees.

{¶31} In support of his final assignment of error, Flowers argues that his right to a fair trial was adversely affected when two jurors saw him in handcuffs outside the courtroom. Flowers contends the trial court abused its discretion in denying his repeated motions for a mistrial on that basis. Flowers further emphasizes that the trial court neither issued a curative instruction, nor conducted a voir dire examination of the jurors who saw Flowers in handcuffs.

{¶32} This Court reviews the trial court's denial of a motion for a mistrial for an abuse of discretion. *State v. Patel*, 9th Dist. No. 24024, 2008-Ohio-4692, ¶ 46. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). Granting a motion for a mistrial is appropriate when the defendant's right to a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991).

{¶33} The United States Supreme Court has held that a criminal defendant cannot be compelled to stand trial while dressed in prison attire. *Estelle v. Williams*, 425 U.S. 501, 512 (1976). However, "courts have refused to embrace a mechanical rule vitiating any conviction, regardless of the circumstances, where the accused appeared before the jury in prison garb. Instead, they have recognized that the particular evil proscribed is compelling a defendant, against his will, to be tried in jail attire." *Id.* at 507. Similarly, absent a particularized need, the usual practice is for the defendant to appear in court free of restraints because the presence of restraints tends to erode the presumption of innocence that our system accords to criminal defendants. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 79. "When a jury's view of the defendant in restraints is 'brief, inadvertent, and outside the courtroom,' there is but a slight risk of prejudice." *State v. Halsell*, 9th Dist. No. 24464, 2009-Ohio-4166, ¶ 7, quoting *State v. Kidder*, 32 Ohio St.3d 279, 286 (1987).

{¶34} Here, after a break in trial during the State's case-in-chief, defense counsel stated on the record that Flowers had told him that two jurors had seen Flowers in handcuffs. Defense counsel then asked the trial court for "any instructions with respect to that issue." When the trial

judge asked Flowers when the jurors might have seen him, Flowers responded, "We were in the hallway. I was instructed to step to the side, but I was handcuffed." Flowers continued, "It was Monday. I don't know what time it was. I know I [saw] two different people in the hallways. And I was instructed to step to the side or they were instructed to leave and walk away while I was handcuffed." When the trial judge responded by noting that the deputies who serve the court take extensive measures to prevent the jury from knowing that a defendant is being held in custody, Flowers responded, "Yes, he did. I give him credit."

{¶35} The trial judge then asked defense counsel if he wanted the court to provide some sort of curative instruction to the jury. Defense counsel stated that he was "not certain" if he wanted a curative instruction because it might highlight the issue. Instead, defense counsel stated, "in the event that this would be something that would raise to the level or a mistrial, we would ask for a declaration thereof." The trial judge then asked the court's deputy if he recalled an instance where members of the jury may have seen Flowers. Deputy Dave Andrews responded, "I believe it was during the first break on Monday after the jury was seated, we were escorting Mr. Flowers up out of the holding area of that hallway. And he is correct, the tall gentleman here on the end. Your Honor, I would only say that he had a – only a fleeting passing view as he walked across the end of the hallway. We stopped, the hallway was cleared. I think I had a conversation with his counselor to make sure that there was nobody else around." Deputy Andrews further stated that the juror got "maybe a one-second view [of Flowers], if at all."

{¶36} The trial judge then denied the motion for a mistrial, but informed the parties that the option remained open to "inquire of those specific jurors who Mr. Flowers thinks may have seen him" and then issue a specific curative instruction. The trial judge noted that he was not inclined to give such an instruction because it might highlight the issue in the minds of those

jurors, but indicated that he was willing to do so if defense counsel so desired. Defense counsel then stated that he would discuss with Flowers whether they wanted a curative instruction. Defense counsel renewed his motion for a mistrial at the end of the State's case-in-chief, at the end of the defense's case, and again immediately prior to sentencing.

{¶37} In this case, the trial court did not abuse its discretion by denying Flowers' motion for a mistrial. Deputy Andrews stated on the record that a juror had merely "a fleeting passing view" of Flowers in the hallway that lasted "maybe one second." Flowers himself admitted that the deputy took measures to ensure that the jury did not know Flowers was being kept in custody. Because the two jurors' view of Flowers was extremely brief, inadvertent, and outside the courtroom, Flowers' right to a fair trial was not substantially jeopardized and the trial court did not abuse its discretion by denying the motion for a mistrial. Moreover, while the trial court indicated that it was willing inquire of the jurors in question and issue a curative instruction, its ultimate decision not to do so emanated from a concern that highlighting the issue could only be prejudicial to Flowers. Under these circumstances, Flowers' third assignment of error must be overruled.

### III.

{¶38} Flowers' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

MOORE, P. J.
DICKINSON, J.
CONCUR

APPEARANCES:

JACQUENETTE S. CORGAN, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.