[Cite as *State v. Dyer*, 2017-Ohio-426.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2015-L-121** |
| DEREK A. DYER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 14 CR 000951.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, *Jenny B. Azouri,* Assistant Prosecutor, and *Alana A. Rezaee,* Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Thomas J. Tatarunas,* Thomas J. Tatarunas, L.P.A., Inc., 7327 Center Street, Mentor, OH 44060 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Derek Dyer, appeals his conviction for Felonious Assault in the Lake County Court of Common Pleas. The issue before this court is whether statements incriminating the defendant made by the victim of domestic violence/assault are admissible: as excited utterances when they are made within an hour of the assault; as statements made for medical treatment when they are made to medical personnel on the evening of the assault; as prior inconsistent statements

despite the lack of a limiting instruction; and when they are contained in written statements but not admitted for the truth of the matter asserted. For the following reasons, we affirm Dyer's convictions.

{¶2} On May 19, 2015, the Lake County Grand Jury returned a three-count Indictment against Dyer, charging him with Felonious Assault, a felony of the second degree in violation of R.C. 2903.11(A)(1); Domestic Violence, a felony of the third degree in violation of R.C. 2919.25(A); and Domestic Violence, a felony of the third degree in violation of R.C. 2919.25(B).

{¶3} On June 5, 2015, Dyer waived his right to be present at arraignment and entered a plea of not guilty to all charges.

{¶4} On September 22, 2015, the State filed a Motion for Calling of Court Witness pursuant to Evidence Rule 614(A). The State moved the trial court to call Nicole Ramian as a court's witness on the grounds that Ramian had recanted statements she had made identifying Dyer as her assailant, Ramian and Dyer are in a romantic relationship, and they have two children together.

{¶5} On the same date, the State filed a Motion in Limine to Determine Admissibility of Victim's Statements under Evid.R. 803(4).

{¶6} On September 24, 2015, Dyer opposed the State's Motions.

{¶7} On September 25, 2015, a hearing was held on the State's Motions, both of which were granted by the trial court.

{¶8} On September 28 and 29, 2015, Dyer's case was tried before a jury.

{¶9} The following evidence was presented on behalf of the State.

{¶10} Patrick Fink, a firefighter and paramedic for the City of Willoughby, testified that, at sometime after midnight on May 9, 2014, he responded to a call at the

2

Willoughby Brewing Company in Willoughby, Ohio. At the scene, he treated Nicole Ramian for injuries. He described her as "very upset, very distraught [at] what happened"; "she had blood on her mouth"; "inconsolable at times to what had gone on"; but also as "coherent." Ramian told Fink that "her boyfriend had hit her." Fink spent about fifteen minutes with Ramian while transporting her to Lake West Hospital.

{¶11} Doctor Joseph Golob, a trauma surgeon at Metro Health Hospital, testified that he treated Ramian on the morning (after 7:00 a.m.) of May 9, 2014, at Metro Health upon her transfer from Lake West for suspected subdural hematoma (or "blood on the brain"). A CT scan and physical exam did not reveal subdural hematoma, but Ramian did have a lacerated lip, nasal and jaw (maxilla) bone fractures, and a missing tooth. On the GCS ("Glasgow Coma Scale") she scored 15, which is "completely normal as far as being awake and alert." Ramian reported that her injuries were caused by being punched by her boyfriend. She was prescribed narcotic medication for pain.

{¶12} Nicole Ramian was called to testify by the court. Dyer is the father of two of her three children. She has been romantically involved with Dyer for about seven years. In May 2014, she and Dyer were estranged on account of him "talking to another girl."

{¶13} On May 8, 2014, Ramian and her sister (Jennifer) went to the Willoughby Brewing Company after dark. Over the course of an hour, she had two or three vodka and cranberry drinks. Ramian also stated she had taken "a bar" of un-prescribed Xanax. The combination of the vodka and Xanax made her feel "a little weird." Eventually, she met Dyer in a semi-private area of the bar (the "VIP section") where he was celebrating his birthday. They began to argue verbally.

3

**{¶14}** Ramian was struck in the face. She "assumed" that Dyer struck her because she had thrown a drink at him, but did not see him punch her. She didn't remember exactly what happened and thought that she had blacked out. All that Ramian could "for real remember is waking up in Metro."

**{¶15}** In written statements, signed by Ramian and dated May 9, 2014, at 1:35 a.m., Dyer is identified as her attacker. The statements advised Ramian that by signing them she wished to press domestic violence charges against Dyer. Ramian, however, had no memory of writing or signing the statements.

**{¶16}** Ramian recalled that on May 12, 2014, she made a statement to her dentist that she assumed Dyer had punched her because she threw a drink at him.

**{¶17}** Ramian testified that she subsequently (also May 12) spoke with a friend, Lea (Leatice) Curry, who also was at the Willoughby Brewing Company on the night of May 8. Ramian went with Curry to the police station and indicated that she no longer wished to press charges against Dyer.

**{¶18}** Lieutenant Richard T. Ashton of the Willoughby Police Department testified that, on the night in question, he was working security at the Willoughby Brewing Company. At about 12:35 a.m. (May 9), Ramian approached him: "she's crying and yelling, and covering, holding her face." There was blood on her face. He asked her what happened and she advised that "the father of her kids punched her in the face, knocked her tooth out."

**{¶19}** Lieutenant Ashton led Ramian to the kitchen (since it was quieter) where she identified Dyer as her assailant. Ramian spoke coherently and did not seem to be impaired. Lieutenant Ashton, accompanied by Ramian's sister, tried without success to locate Dyer in the bar.

4

**{¶20}** Officer Paul Sciarrino of the Willoughby Police Department testified that, on the morning of May 9, he responded to a call at the Willoughby Brewing Company. Upon his arrival, Lieutenant Ashton briefed him about the situation. He spoke with Ramian in the kitchen. He described her as "hysterical" (crying and upset), "holding a towel that was bloody to her face." She repeated to him several times that "he knocked my front teeth out," he being Dyer, the father of her children.

**{¶21}** Officer Sciarrino met with Ramian again at Lake West Hospital to obtain written statements and photographs. In speaking with her, Officer Sciarrino testified that Ramian did not appear intoxicated or otherwise impaired in any way.

**{¶22}** Officer Sciarrino testified that on May 14 he was advised by Ramian that she did not wish to press charges against Dyer.

**{¶23}** Doctor Jennifer Becker, a dentist with Hudec Dental, evaluated Ramian on May 12, 2014. Ramian was emotional and teary during the examination. Ramian was missing a front tooth and a couple of other teeth were fractured. Ramian explained that she had been punched in her face by her boyfriend.

**{¶24}** Jennifer Williams, an emergency department nurse at Lake West Hospital, assessed a "tearful" Ramian at about 1:00 a.m. on May 9. Ramian's blood alcohol level was 0.08, which would be consistent with the consumption of two or three drinks that evening. Ramian was coherent and cooperative in her interactions with Williams. She asked what happened and Ramian replied that "she was punched in the face, closed fist, by her boyfriend." Ramian also stated that she was not sure if she had lost consciousness and that the incident happened quickly.

**{¶25}** The following evidence was presented on behalf of Dyer.

**{¶26}** Leatice Curry testified that he knows both Dyer and Ramian. He was at the Willoughby Brewing Company on the night in question independently of Dyer and Ramian. He noted Ramian was "out of character" and not a "normal drunk." He observed her swearing at Dyer and throw her drink, which landed on several people around Dyer. He saw a man wearing a gray hoodie and black sweatpants punch Ramian and, then, walk into the crowd. Ramian was knocked down, but not out. Curry tried to follow the assailant but was unable to do so. He reported what he saw to a bouncer.

**{¶27}** Curry spoke with Ramian the next day and told her that it was not Dyer but an unidentified man in a gray hoodie who had punched her. Curry accompanied Ramian to the police station and tried to make a statement, but the police would not accept it.

**{¶28}** Dyer testified that he is currently in a relationship with Ramian ("the love of my life") and that they are raising their two children together.

**{¶29}** Dyer admitted to having two prior Domestic Violence convictions, not involving Ramian, as well as convictions for drug-related offenses and Attempted Abduction.

**{¶30}** Dyer admitted that, on May 8, 2014, he and Ramian were separated because he had been caught "messing with another girl." He was at the Willoughby Brewing Company to celebrate his birthday in the VIP section. He arrived sometime after 10:00 p.m.

**{¶31}** Dyer met with Ramian upon arriving at Willoughby Brewing Company, and they argued briefly about money. Dyer also met Curry that evening, and invited him to join him in the VIP section.

6

{¶32} Dyer met Ramian a second time at about 12:30 a.m. and they resumed arguing. When Ramian threw her drink, Dyer turned to avoid it. Someone shouted, "bitch," and, when Dyer turned back around, he saw Ramian being punched. He then went looking for the man who punched her, described as wearing black jeans and a grey sweater, until he learned that "he was being looked for." Dyer became scared, left the bar and went home.

{¶33} Dyer called Ramian repeatedly in the days following the incident, but without being able to make contact with her.

{¶34} On September 30, 2015, the jury returned its verdict finding Dyer guilty of all charges.

{¶35} The trial court proceeded immediately to sentencing, merging the two Domestic Violence counts into the Felonious Assault count. The court sentenced Dyer to six years' imprisonment, advised him that he would be subject to three years of mandatory post release control, and charged him with the costs of prosecution.

{¶36} On October 29, 2015, Dyer filed a Notice of Appeal. On appeal, Dyer raises the following assignment of error:

{¶37} "[1.] The trial court's improper admission of numerous hearsay statements and failure to properly instruct the jury of said statements['] non-substantive nature as well as the trial court improperly instructing the jury that such statements were substantive evidence constituted plain error and deprived Appellant of his right to a fair trial."

{¶38} In this assignment of error, Dyer complains that the trial court admitted out of court statements identifying him as Ramian's assailant without providing a limiting

instruction that such statements were not substantive in nature and could only be used for purposes of impeachment.

**{¶39}** Our standard of review in the present case is both abuse of discretion and plain error.

**{¶40}** With respect to the admission of Ramian's out-of-court statements, the standard is abuse of discretion. *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991) ("a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence"); *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus ("[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court").

**{¶41}** With respect to the failure to provide a limiting instruction, Dyer failed to request such an instruction or to object to the jury instructions as given, thereby waiving all but plain error. Crim.R. 30(A) ("[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict"); *State v. Williford*, 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990) ("[w]e have repeatedly held that a failure to object before the jury retires in accordance with the second paragraph of Crim.R. 30(A), absent plain error, constitutes a waiver").

**{¶42}** "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

8

**{¶43}** The plain error standard also applies in instances where testimony is admitted without objection by the defendant. *State v. Slagle*, 65 Ohio St.3d 597, 604, 605 N.E.2d 916 (1992) ("[a]s a general rule an appellate court will not consider an alleged error that the complaining party did not bring to the trial court's attention at the time the alleged error is said to have occurred").

**{¶44}** "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). "It is axiomatic that hearsay evidence is inadmissible unless it falls within the specific hearsay exceptions enumerated in the Rules of Evidence." *State v. DeMarco*, 31 Ohio St.3d 191, 195, 509 N.E.2d 1256 (1987).

**{¶45}** Dyer identifies seven out of court statements made by Ramian and admitted at trial in which he was identified as the assailant: (1) an oral statement to Lieutenant Ashton; (2) an oral statement to Officer Sciarrino; (3) an oral statement to Fink (paramedic); (4) an oral statement to Williams (nurse) also quoted in the medical records; (5) an oral statement to Dr. Golob; (6) an oral statement to Dr. Becker; and (7) two written statements for Officer Sciarrino.

**{¶46}** The first three of these statements, those made to Lieutenant Ashton, Officer Sciarrino, and Fink are fairly admissible under the excited utterance exception to the hearsay rule.

**{¶47}** Under this exception, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the rule against hearsay. Evid.R. 803(2). Essential to admissibility of statements under this exception is that "the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made

9

before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs." (Citation omitted.) *State v. Taylor*, 66 Ohio St.3d 295, 301, 612 N.E.2d 316 (1993). "[T]he lapse of time between the startling event and the out-of-court statement is not dispositive in the application of Evid.R. 803(2) * * * [r]ather, the question is whether the declarant is still under the stress of nervous excitement from the event." *State v. Boston*, 46 Ohio St.3d 108, 118, 545 N.E.2d 1220 (1989).

{¶48} Lieutenant Ashton, Officer Sciarrino, and Fink encountered Ramian within an hour of the assault when she was clearly still under the stress of excitement caused by the attack.

{¶49} The next two statements related by Nurse Williams and Dr. Golob were the subject of the Motion in Limine filed by the State, arguing for their admission as statements made for the purpose of medical diagnosis and treatment.[1] Under the medical diagnosis or treatment exception, "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not excluded by the hearsay rule. Evid.R. 803(4).

{¶50} A recurrent issue with respect to the medical diagnosis or treatment exception is whether statements identifying and incriminating the defendant are admissible. This court has followed the general rule "that a statement as to the identity

---

1. On appeal, the State asserts that the statements to Nurse Williams and Dr. Golob also constitute excited utterances. While arguable, there is no indication in the record that the trial court considered them as such when ruling on their admission.

of the perpetrator of a criminal act, which is not reasonably related or necessary to medical diagnosis, is not admissible under Evid.R. 803(4)." *State v. Ashford*, 11th Dist. Trumbull No. 99-T-0015, 2001 WL 137595, 8 (Feb. 16, 2001) (cases cited); *State v. Smith*, 8th Dist. Cuyahoga No. 90476, 2008-Ohio-5985, ¶ 38 ("[a]bsent some evidence that the identity of the perpetrator is necessary for medical purposes, statements identifying an assailant are not properly admitted pursuant to Evid.R. 803(4)") (citation omitted).

**{¶51}** In the present case, the trial court found Dyer's identity reasonably related to medical diagnosis or treatment:

> [A] doctor has to know who she's going home to. And if she's going home to an assailant, the doctor has a duty not to discharge her into the custody of a potential assailant. A doctor has a duty not to put her into the same position that may have brought her for medical treatment. So that's all part of medical diagnosis. The identity of the perpetrator is part of the medical diagnosis in a physical assault case. So it's my ruling that all of that will be admitted.

**{¶52}** The trial court's justification for its ruling was echoed in the testimony of Nurse Williams, who stated that treatment includes "patient safety" and that, if the situation had occurred, Dyer would have been prevented from having contact with Ramian. *Compare State v. Flowers*, 9th Dist. Summit No. 25841, 2012-Ohio-3783, ¶ 23 ("[t]his Court [the Ninth District] has consistently held that a description of the encounter and even identification of the perpetrator are within the exception, as statements made for purposes of diagnosis or treatment") (citations omitted).

11

**{¶53}** We find the admission of the statements by Nurse Williams and Dr. Golob to be harmless error as they were cumulative to the properly admitted statements of Lieutenant Ashton, Officer Sciarrino, and Fink identifying Dyer as the assailant. *State v. Williams*, 38 Ohio St.3d 346, 350, 528 N.E.2d 910 (1988) (the erroneous admission of hearsay, cumulative to the testimony of other witnesses at trial, constitutes harmless error); *Smith*, 2008-Ohio-5985, at ¶ 39.

**{¶54}** The sixth statement was introduced through the testimony of Ramian's dentist, Dr. Becker, and was made on May 12 (three days after the assault), the same day that Ramian indicated that she no longer wished to press charges against Dyer.

**{¶55}** Dr. Becker testified that Ramian identified her boyfriend as the person who had punched her. Ramian testified that she told Dr. Becker "I assumed he punched my teeth out, cause that's who I threw my drink at." The trial court admitted the testimony as a prior inconsistent statement.

**{¶56}** "Extrinsic evidence of a prior inconsistent statement by a witness is admissible * * * [i]f the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;" and "[t]he subject matter of the statement is * * * [a] fact that is of consequence to the determination of the action other than the credibility of a witness." Evid.R. 613(B)(1) and (2)(a).

**{¶57}** Applying this Rule, Ohio courts have regularly allowed the introduction of a witness' prior inconsistent statement solely for the purposes of impeaching that witness' credibility, not as substantive evidence of the defendant's guilt. *State v. McKelton*, __ Ohio St.3d __, 2016-Ohio-5735, __ N.E.3d __, ¶ 125. Accordingly, "[s]tatements

admitted under Evid.R. 613(B) require a limiting instruction to inform the jury that the prior statements were only to be considered for impeachment purposes." *State v. Armstrong*, 11th Dist. Trumbull Nos. 2001-T-0120 and 2002-T-0071, 2004-Ohio-5635, ¶ 109; *State v. Fields*, 8th Dist. Cuyahoga No. 88916, 2007-Ohio-5060, ¶ 17; Evid.R. 105 ("[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request of a party, shall restrict the evidence to its proper scope and instruct the jury accordingly").

{¶58} As noted above, Dyer did not request a limiting instruction or otherwise object to the jury instructions as given, thus limiting our review to plain error. The absence of a limiting instruction in the present case does not rise to that level, having had no conceivable influence on the outcome of the trial. Ramian's identification of Dyer as her assailant was properly put before the jury at least three times through the testimony of Lieutenant Ashton, Officer Sciarrino, and Fink. Moreover, Ramian did not deny making a statement to Dr. Becker implicating Dyer, although at trial she equivocated with respect to her identification of Dyer. In light of the considerable substantive evidence of Dyer's guilt and the obvious import of Dr. Becker's testimony as impeaching Ramian's subsequent equivocation, the failure to give a limiting instruction with respect to Dr. Becker's testimony was inconsequential. *McKelton* at ¶ 130 (lack of limiting instruction with respect to a witness' prior inconsistent statement was not "outcome-determinative" where other witnesses testified substantively as to the same statement); *State v. Kimbrough*, 11th Dist. Lake No. 97-L-274, 1999 WL 540909, 10 (July 9, 1999) ("the admission of extrinsic evidence of Layfield's [prior inconsistent]

13

statement was harmless error" where "the remaining evidence, standing alone, constitute[d] overwhelming proof of the defendant's guilt").

{¶59} The final statements that Dyer contends were improperly before the jury are written statements by Ramian describing the assault written within an hour of the assault for Officer Sciarrino. The substance of these statements mirrors Officer Sciarrino's testimony as to what Ramian told him following the assault. Dyer did not object to the admission of these written statements, thus, we are limited to notice plain error affecting substantial rights. Evid.R. 103(A)(1) and (D) ("[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and * * * timely objection or motion to strike appears of record stating the specific ground of objection," although "[n]othing in this rule precludes taking notice of plain errors affecting substantial rights").

{¶60} The trial court indicated in the pre-trial hearing that the written statements would be admissible, not to prove the truth of the matter asserted, but as relevant to the issue of Ramian's coherence and ability to perceive events at the time of the assault. Ramian claimed that, in addition to the vodka drinks, she had taken Xanax which may have contributed to her inability to remember events. Dyer and Curry both testified, contrary to the other witnesses that interacted with Ramian that evening, that she was noticeably drunk. The court stated:

> They'll be able to see her statements * * * to judge not the truth of
> the matter asserted, but whether she was of proper composition to
> write the statement out. So her credibility will be an issue * * *.
> And the statements haven't been offered, but I would think that
> there is a separate purpose, since you've raised the issue through

14

her testimony, that she may have been so out of it with the combination of the Xanax and the 3 drinks, whether she could even write out a statement, or form an opinion as to her observations. So in order to fulfill the fact finding purpose of the trial, those will be admissible.

**{¶61}** As the trial court articulated a cogent rationale for the admission of the written statements as nonhearsay, their admission does not constitute plain error or even an abuse of discretion (had an objection been duly raised).[2]

**{¶62}** Lastly, Dyer argues the trial court erred by not admitting Ramian's written statement of May 12, 2014, wherein she advised the police that she was recanting her prior statements which identified Dyer as the assailant. Dyer maintains that the statement is not hearsay as a prior consistent statement. "A statement is not hearsay if * * * [t]he declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive." Evid.R. 801(D)(1)(b).

**{¶63}** The trial court ruled the May 12 written statement was inadmissible noting that the prior written statements (made within an hour of the assault) "were done under circumstances quite different than this one. She's had time to reflect before she wrote

---

2. Since they were not admitted for the truth of the matter asserted, it is arguable that a limiting instruction would have been appropriate with respect to the written statements. For the reasons set forth in connection with the admission of Dr. Becker's testimony, the lack of such instruction does not constitute plain error. Dyer's reliance on *State v. Armstrong*, 11th Dist. Trumbull Nos. 2001-T-0120 and 2002-T-0071, 2004-Ohio-5635, is misplaced. In *Armstrong*, this court held that the lack of a limiting instruction on the use of impeachment evidence was "fatal and plain error." *Id.* at ¶ 109. *Armstrong* is distinguishable, however, in that the impeachment evidence at issue therein "comprised the only direct link between appellant and the murder-for-hire scheme," and "the remaining evidence, standing alone, was inconclusive or suspect circumstantial evidence." *Id.* at ¶ 121. In the present case, there was significant evidence of Dyer's guilt of which the written statements were merely duplicative.

15

this one [on May 12]. * * * This was done after everything has calmed down and after she's had time to reflect, after she's been worked on by Lea Curry and Derek Dyer."

{¶64} We find no abuse of discretion. The purpose of allowing a prior consistent statement is to rebut the implication that Ramian changed her testimony due to influence or pressure exerted by Dyer. Her May 12 written statement to the police does not serve this purpose because it was made after Dyer had repeatedly contacted Ramian to deny his involvement and after she had discussed the matter with Curry, who accompanied her to the police station when she wrote the statement. Admission of the May 12 statement would not have served the purpose of the Rule. Additionally, Ramian was allowed to testify that she returned to the police station on May 12 because she wanted to change or correct her prior written statements and Officer Sciarrino testified that Ramian was at the police station on May 12 and that she expressed a desire not to press charges and wrote a third statement at this time.

{¶65} The sole assignment of error is without merit.

{¶66} For the foregoing reasons, Dyer's conviction for Felonious Assault is affirmed. Costs to be taxed against the appellant.


TIMOTHY P. CANNON, J., concurs in judgment only with a Concurring Opinion,
THOMAS R. WRIGHT, J., concurs in judgment only with a Concurring Opinion.


_____


TIMOTHY P. CANNON, J., concurring in judgment only.

16

{¶67} I respectfully concur with the judgment of the lead opinion in affirming appellant's conviction.

{¶68} I agree, as the lead opinion notes, that the admission of testimony from Dr. Golob and Nurse Williams was error, albeit harmless. However, I write to clarify that the trial court does not have "discretion" to admit hearsay. With regard to some evidentiary rulings, such as relevancy, the trial court must exercise discretion as to the admissibility of the evidence. In contrast, hearsay is simply inadmissible unless a valid exception exists. Evid.R. 802. Clearly, there are times when the trial court must make a factual determination as to whether an exception exists, but if the trial court determines a statement is hearsay, and no exception exists, there is no discretion to allow its admission. *Jack F. Neff Sand & Gravel, Inc. v. Great Lakes Crushing, Ltd.*, 11th Dist. Lake No. 2012-L-145, 2014-Ohio-2875, ¶23.

{¶69} The lead opinion notes that the "trial court found Dyer's identity reasonably related to medical diagnosis or treatment" when it issued a ruling at a hearing on a motion in limine. When the trial court made that ruling, it was prior to trial and prior to any testimony in that regard. There was no evidence introduced at trial that the identity of the perpetrator was necessary to the medical providers for the diagnosis and treatment of the victim.

{¶70} The lead opinion states, "[t]he trial court's justification for its ruling was echoed in the testimony of Nurse Williams, who stated that treatment includes 'patient safety.'" Nurse Williams testified that if appellant had come to the hospital while Ms. Ramian was a patient, she would have noted that he had come to the hospital in the medical record because "we're there to protect the patient. I would have involved

17

security, probably would not have let him back at that point." However, this testimony does not reflect "treatment" as explained by the staff notes to Evid.R. 803(4).

{¶71} The staff notes of Evid.R. 803(4) state, "[t]he circumstantial guaranty of trustworthiness of [statements for purposes of medical diagnosis or treatment] is derived from the assumption that a person will be truthful about his physical condition to a physician because of the risk of harmful treatment resulting from untruthful statements." In the present case, untruthfulness about the identity of the perpetrator did not create a risk that the patient would receive harmful treatment or an incorrect diagnosis.

{¶72} The lead opinion cites to this court's decision in *State v. Ashford*, 11th Dist. Trumbull No. 99-T-0015, 2001 Ohio App. LEXIS 583 (Feb. 16, 2001). That case involved a minor child who was the victim of sexual abuse, and the court found the identity of the abuser may have been pertinent to the "psychological treatment and diagnosis" of the victim, in that it may have been necessary to remove the child from the home. These facts are distinguishable from the present case. Here, there is no indication or testimony from either Dr. Golob or Nurse Williams that knowing the perpetrator's identity was necessary for the psychological treatment and diagnosis of the victim. As a result, I agree it was error to admit the testimony.

_____

THOMAS R. WRIGHT, J., concurs in judgment only with a Concurring Opinion.

{¶73} I agree with the majority's conclusion as clarified by the concur in judgment only with a concurring opinion regarding discretion. Nevertheless, I write

18

separately since the lead opinion finds harmless error without first analyzing why the perpetrator's identity is inadmissible under Evid.R. 803(4).

{¶74} Here, the assailant's identity was not pertinent to diagnosis or treatment, and thus lacks circumstantial trustworthiness. Staff Notes, Evid.R. 803(4). The Tenth District Court of Appeals has said it well: "[T]he underlying rationale of the exception has remained the same; namely, the commonsense notion that you have a strong incentive to tell the truth and get it right when describing your condition to a doctor who could wield a sharp scalpel." (Citation omitted.) *State v. Clary*, 73 Ohio App.3d 42, 596 N.E.2d 554, *52 (1991). As there were no adverse diagnosis or treatment consequences to the victim in the event of misidentification, actual or perceived, the perpetrator's identity is inadmissible under Evid.R. 803(4).

{¶75} I acknowledge that circumstances may arise in which an assailant's identity is pertinent to diagnosis or treatment. However, this is not that case.