[Cite as *Rudzik Excavating, Inc. v. Mahoning Valley Sanit. Dist.*, 2017-Ohio-8630.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| RUDZIK EXCAVATING, INC., | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | CASE NO.  2017-T-0008 |
| THE MAHONING VALLEY SANITARY | : | |
| DISTRICT, | | |
| | : | |
| Defendant-Appellant. | | |
| | : | |

Civil Appeal from the Trumbull County Court of Common Pleas, Case No. 2015 CV 01300.

Judgment:  Affirmed.

*Stuart A. Strasfeld* and *David S. Barbee,* Roth, Blair, Roberts, Strasfeld & Lodge, 100 Federal Plaza East, Suite 600, Youngstown, OH  44503 (For Plaintiff-Appellee).

*Thomas J. Wilson,* Comstock, Springer & Wilson Co., L.P.A., 100 Federal Plaza East, #926, Youngstown, OH  44503 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, P.J.

{¶1}   Appellant, the Mahoning Valley Sanitary District ("the District"), appeals the judgment of the Trumbull County Court of Common Pleas, following a jury trial, awarding appellee, Rudzik Excavating, Inc., $525,210 in damages on Rudzik's claim against the District for breach of contract.  At issue is whether the trial court erred in denying the District's motion for directed verdict.  For the reasons that follow, we affirm.

{¶2} Rudzik filed a complaint against the District, seeking an unspecified amount of damages for breach of contract. The District filed an answer and counterclaim demanding repayment of an amount it claimed it had overpaid Rudzik. At the District's request, the case proceeded to trial by jury.

{¶3} The District sells water to its member cities, Youngstown, Niles, and McDonald, which in turn sell water to residents of other jurisdictions. As part of the process of making drinkable water, the District maintains lime-sludge lagoons. Lime is a by-product of producing drinkable water. The lime settles at the bottom of storage tanks and is pumped out to lime-sludge lagoons. Water is pumped from the lagoons, which then become full of lime sludge, which must periodically be removed from the lagoons.

{¶4} In December 2014, the District advertised for bids on Contract G-106 ("the contract"), a lime-sludge removal contract. The advertisement said, "[t]he work for which proposals are invited includes Removal and Land Application/Beneficial Reuse of Lime Sludge from sludge lagoons, which * * * are located in Weathersfield Township * * *. It is estimated that the amount of sludge to be removed and * * * reused from the Bid for Lagoon G is * * * 50,000 cubic yards."

{¶5} The District prepared Specifications and Instructions to Bidders. The Bid Proposal Form prepared by the District showed the project had three parts: "Base Bid 1," "Alternate Bid 2," and "Alternate Bid 3." According to the contract documents, Base Bid 1 involved the removal of lime sludge from Lagoon G and land application/beneficial reuse of the sludge; placement of sand in Lagoon G; and a couple of miles of road-repair work around the lagoons. Alternate Bid 2 was for the placement of sand in

2

another lagoon, Lagoon E (the sludge in that lagoon having previously been removed). Finally, Alternate Bid 3 was for the installation of 24 new "sluice gates" to control the flow of water in the lagoons.

{¶6} The District's Bid Proposal Form included a section for bidders to insert a total price for work to be performed under Base Bid 1. It also provided a space for the cost to remove sludge per cubic yard from Lagoon G. The form said the total price was to be determined by multiplying 50,000 cubic yards of sludge by the dollar amount ("unit price") to be proposed and inserted by the bidder. The form also included a section for the total price for work under Alternate Bid 2 with a space for the price to install sand per cubic yard. Alternate Bid 3 simply asked for the cost to replace 24 sluice gates.

{¶7} The District's Instructions to Bidders provided that if any bidder was "in doubt as to the * * * meaning of any part of the Contract Documents," the bidder could submit a written request to the District's Chief Engineer for interpretation." The Chief Engineer would respond to a request for information by issuing an Addendum, a copy of which would be provided to all bidders. Further, the contract defined the word "contract" as including any Addenda.

{¶8} The District's Chief Engineer testified that, in response to questions bidders asked concerning the Instructions, he issued two Addenda to the contract instructing bidders how to prepare their bids. He testified that Addendum 1 instructed bidders "to include whatever was necessary for the contractor to complete that portion of the work in the bid." He instructed them to "add up their numbers for labor, material costs, insurance, overhead and profit, to make a whole number." He said their total bid amount was to be the total of their costs for completing the work.

3

**{¶9}** Addendum I advised bidders that, as to Base Bid I, their bid amount should be the total of the following costs: the cost of removing 50,000 cubic yards of sludge from Lagoon G; the cost of placing six inches of sand in that lagoon; the cost of labor, equipment, and materials; the cost to dig out pothole areas and fill them with six inches of limestone and to lay three inches of limestone on the whole roadway; and the cost of roadway repairs from Salt Springs Road to the lagoons.

**{¶10}** This Addendum contradicted the language of Base Bid 1 in the District's Bid Proposal Form, which simply instructed bidders to multiply 50,000 cubic yards of sludge to be removed from Lagoon G by a dollar amount ("unit price") to be proposed by the bidder in arriving at the total bid amount of Base Bid 1.

**{¶11}** Addendum 1 also stated that "[a]ny unused item(s) in this contract will be a credit back to the project," meaning it would be a credit to the District. The Bid Proposal Form did not mention anything about credits.

**{¶12}** After Addendum 1 was issued, bidders still had questions about the contract, so the Chief Engineer issued Addendum 2. This Addendum explained that for Base Bid 1 and Alternate Bid 2, bidders should make sure the "top line and dollar figure" included their total cost for that part of the work. As to Alternate Bid 2, the "second line per cubic yard" should show the cost of the sand delivered to the lagoon per cubic yard, which indicated the District would receive a credit for sand it provided for the project.

**{¶13}** On January 13, 2015, James Tressa, Rudzik's project manager, submitted Rudzik's proposal. The Base Bid 1 "top line" figure was the fixed amount of $1,260,000, which was stated to be a product of 50,000 cubic yards times $16 per cubic yard of sludge. However, $16 times 50,000 cubic yards only equals $800,000. The balance of

4

the $1,260,000 bid included Rudzik's other costs to complete Base Bid 1, as the Chief Engineer had instructed the bidders to do in the Addenda.

{¶14} Rudzik's Alternate Bid 2 was the fixed amount of $234,000 for sand placement in Lagoon E. Alternate Bid 3 was the fixed amount of $200,000 to provide and install 24 sluice gates.

{¶15} Of the three contractors who submitted bids, the Chief Engineer determined that Rudzik submitted the lowest total bid ($1,694,000, based on the total amounts of each of the three bid items).

{¶16} Before the contract was awarded, the Chief Engineer e-mailed Mr. Tressa, asking him for a breakdown of Rudzik's costs for sludge removal and sand placement. He also asked for the cost of Base Bid 1 and Alternate Bid 2 if the District provided the sand. Mr. Tressa provided a breakdown of all his costs that comprised Base Bid 1 in the amount of $1,260,000. Of this amount, Mr. Tressa allocated $905,000 for lime-sludge removal. The balance of the $1,260,000 total bid was comprised of Rudzik's other costs, including the costs for sand installation and road repair. At the Chief Engineer's request, the breakdown also showed that Rudzik would provide a lime-sludge credit to the District of $16 per cubic yard under Base Bid 1 (for every cubic yard removed less than 50,000 cubic yards) and a sand credit of $50 per cubic yard under Alternate Bid 2 (for every cubic yard of sand provided by the District for the project).

{¶17} After the Chief Engineer received this breakdown, he awarded the contract to Rudzik without changing Rudzik's price to fit the formula set forth in the contract. Further, the District Treasurer certified that the full contract price for all three parts of the contract - $1,694,000 - had been appropriated by the District to meet its

5

payment obligation under the contract. Thus, the Chief Engineer approved the breakdown provided by Rudzik.

{¶18} As to the lime-sludge removal part of Base Bid 1, Rudzik subcontracted that work to C. Crump & Associates, which had previously performed lime-sludge removal work for the District. Crump's crew removed lime sludge from February 2015 through May 2015. Crump removed the lime sludge and delivered it to area farmers to be mixed with their soil for beneficial reuse.

{¶19} By March 9, 2015, one-half of the lime sludge in Lagoon G was removed. Based on Crump's daily logs, Crump had removed 25,040 cubic yards of lime sludge from Lagoon G. The contract provided that Rudzik could request periodic payments as work progressed. Thus, on March 16, 2015, Rudzik submitted its first application for payment based on the percentage of work completed and the fixed prices shown in the contract. Since the work under Base Bid 1 was 35 per cent completed, the gross amount of the application was for $441,000 (35% x $1,260,000). Rudzik's application for payment was also consistent with the price breakdown Mr. Tressa gave the Chief Engineer before the contract was awarded.

{¶20} However, the Chief Engineer objected to the application because, he said, the application did not comply with the contract. The Chief Engineer told Mr. Tressa that the District was only required to pay the unit price of $16 per cubic yard of sludge actually removed. The Chief Engineer said that Rudzik was not entitled to payment for a percentage of the total cost of removal of the sludge or a percentage of any of Rudzik's other costs, such as its cost of labor, equipment, materials, and road-repair

work (although the Chief Engineer had specifically instructed bidders in the Addenda to add those costs in arriving at their "total" contract prices).

{¶21} Mr. Tressa told the Chief Engineer that the contract was a fixed-price or lump-sum contract, not based on unit prices. Thus, the amount of the contract was the total amount of Base Bid 1 in the amount of $1,260,000, to be paid in increments as the work progressed based on the percentage of work done.

{¶22} Mr. Tressa testified that Rudzik had to revise its payment application five times before the District agreed to make any payment. Finally, Rudzik issued an application for $470,517. This amount included a charge of $400,640 for the removal of 25,040 cubic yards of lime sludge at $16 per cubic yard, with the balance being the percentage of other contract work performed and costs incurred.

{¶23} However, the District only paid Rudzik $400,640 for the sludge removal, and refused to pay anything toward Rudzik's other costs. Mr. Tressa accepted this partial payment on the understanding that such acceptance would not constitute a waiver of any of Rudzik's rights. Despite this dispute, Mr. Tressa said Rudzik continued its excavation work, hoping that after Rudzik had fully performed the sludge-removal work, the District would pay the full amount owed under the contract.

{¶24} After Rudzik removed the remaining 22,460 cubic yards of lime sludge from Lagoon G, on or about May 20, 2015, Rudzik sent the District a second application for payment of the balance owed for the sludge-removal work.

{¶25} However, on July 9, 2015, the District's attorney sent a letter to Rudzik, refusing to pay any part of the work covered in Rudzik's second application and, in fact, demanding Rudzik repay part of the funds the District had paid under Rudzik's first

7

application for payment. Per the contract, the District had hired a surveyor to estimate the amount of lime sludge removed from Lagoon G. The surveyor concluded that only 22,630 cubic yards had been removed. For this reason, the District's attorney advised Rudzik it had been overpaid for the lime sludge removed. The District's attorney said that, at $16 per cubic yard of sludge removed, the District only owed Rudzik $362,080 for all the work Rudzik had done and, in light of the amount previously paid to Rudzik, the District demanded that Rudzik repay it $39,560. The District's attorney also advised Rudzik to stop performing any further work under the contract, and Rudzik was thus prevented from completing the other work under Base Bid 1 or any work under Alternate Bid 2 and Alternate Bid 3.

**{¶26}** Mr. Tressa testified that, based on Crump's determination that it had removed 47,500 cubic yards of sludge, Rudzik was entitled to an additional $496,987 for the completed work on Base Bid 1 ($496,987 = $1,260,000 minus the $400,640 the District had already paid and minus a credit of $362,372 for sludge not removed and sand provided by the District). In addition, Mr. Tressa said that Rudzik calculated its lost profit on the contracted work the District prevented it from performing under Base Bid 1, Alternate Bid 2, and Alternate Bid 3 in the amount of $71,677. However, the trial court only allowed the jury to consider the lost profit Rudzik would have earned had it been permitted to perform the remaining work allocated to Base Bid 1 (sand placement in Lagoon G and road-repair work) in the amount of $28,223.

**{¶27}** After Rudzik presented its case, and again at the close of the evidence, the District moved for a directed verdict, arguing that Rudzik could not prevail on its breach-of-contract claim because the contract was clearly and unambiguously a unit-

8

price contract. In opposition, Rudzik argued that, according to the contract documents, reasonable minds could reach different conclusions as to whether this was a unit-price or a fixed-price contract, as a result of which, Rudzik argued, the District was not entitled to a directed verdict. In denying the District's motions, the trial court implicitly found that the contract was ambiguous as to whether it was a unit-price or a fixed-price contract.

{¶28} Following the presentation of the evidence, the jury returned a verdict in favor of Rudzik and against the District on Rudzik's breach-of-contract claim and on the District's counterclaim. The jury also made findings in response to a series of jury interrogatories. At the District's request, the trial court submitted an interrogatory asking the jury to find whether the contract between Rudzik and the District was clear and unambiguous. In response, the jury answered, "no." Also, at the District's request, the trial court submitted interrogatories asking the jury to find whether the contract was "a unit priced contract," as the District had maintained, or a "fixed price or lump sum contract," as Rudzik had argued. The jury found the contract was not a unit-price contract, but, rather, was a fixed-price or lump-sum contract.

{¶29} In response to other interrogatories, the jury set forth the dollar amount of the damages due to Rudzik from the District under the terms of the contract as $496,987 for unpaid completed work and $28,223 for lost profits, for a total of $525,210.

{¶30} The court entered judgment on the jury's verdict. Subsequently, the District filed a motion for new trial, or in the alternative, to reduce the jury's verdict. The trial court denied the motion.

9

**{¶31}** The District appeals the trial court's judgment on the jury's verdict, asserting two assignments of error. For its first, it alleges:

**{¶32}** "The trial court erred as a matter of law when it overruled the District's motion for directed verdict."

**{¶33}** A motion for directed verdict should be granted when the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could reach only one conclusion on the evidence and that conclusion is adverse to such party. Civ.R. 50(A)(4). Under this test, if the adverse party presents any probative evidence to support his or her claim, the motion for directed verdict must be denied. *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 69 (1982). A trial court's ruling on a motion for directed verdict presents a question of law, which we review de novo. *Kelsh v. WCI Steel, Inc.*, 11th Dist. Trumbull No. 2011-T-0006, 2012-Ohio-403, ¶19.

**{¶34}** In order to prevail on its claim for breach of contract, Rudzik was required to demonstrate the existence of a contract, its performance, the District's breach, and damages as a result of the breach. *Byers Dipaola Castle, LLC v. Portage County Bd. Of Comm'rs.*, 11th Dist. Portage No. 2014-P-0047, 2015-Ohio-3089, ¶23.

**{¶35}** Here, the existence of the contract is undisputed. It is also undisputed that Rudzik performed under the contract, at least until the District's attorney ordered Rudzik to stop its performance – after Rudzik completed removal of the lime sludge from Lagoon G. The parties disputed the last two elements, i.e., whether the District breached the contract and the amount of Rudzik's damages. The determination of these two issues was dependent on whether the contract was a unit-price contract or a

10

fixed-price contract. Rudzik argued that it should be paid for sludge removal and reuse, sand placement, and road repairs on the basis of its lump-sum price. In contrast, the District argued that payment should be based on a unit price of $16 per cubic yard of sludge removed.

{¶36} The first issue raised by the District under this assigned error is whether the trial court erred by allowing the jury to determine whether the contract was a unit-price or fixed-price contract.

{¶37} "A contract can only be interpreted if the provisions are ambiguous or uncertain." *Career & Technical Assn. v. Auburn Vocational School Dist. Bd. Of Edn.*, 11th Dist. Lake No. 2013-L-010, 2014-Ohio-1572, ¶18. "Contract language is ambiguous if it is susceptible to two or more reasonable interpretations." *Id.* "The determination of whether provisions in a contract are ambiguous is a legal issue that we review de novo." *Id.* Further, "if the contract language is capable of two reasonable interpretations, there is an issue of fact [for the jury] as to the parties' intent." *Id.* "When a contract term is ambiguous, the [jury] must examine parol or extrinsic evidence to determine the parties' intent." *Id.*

{¶38} In the area of public construction projects, a fixed-price contract sets one price for the project as a whole, while a unit-price contract sets the price per unit, but does not set the number of units. *Seneca Valley, Inc. v. Caldwell*, 156 Ohio App.3d 628, 2004-Ohio-1730, ¶32 (7th Dist.). The unit price set forth in such contract is a pre-negotiated price. *Id.* at ¶98.

{¶39} The District argues the trial court erred by allowing the jury to decide whether the contract was clear and unambiguous with respect to whether the contract

11

was a unit-price contract or a fixed-price contract because, in its view, the contract was clearly and unambiguously a unit-price contract. However, the District is barred by the invited-error rule from making this argument because the interrogatory asking the jury to decide whether the contract was clear and unambiguous was *submitted by the District*. "Any error in relation to a jury instruction specifically requested by the defense is invited, and, in order to prevent a party from inducing the trial court to commit an error and later take advantage of it on appeal, we deem any error that may have resulted from a requested instruction as being waived." *State v. Beaver*, 119 Ohio App.3d 385, 395 (11th Dist.1997). *Accord Machnics v. Sloe*, 11th Dist. Geauga No. 2004-G-2554, 2005-Ohio-935, ¶36.

**{¶40}** In any event, the contract documents as a whole demonstrate the contract is ambiguous. In support of its position that the contract was a unit-price contract, the District relies on the Instructions to Bidders and its Bid Proposal Form, which indicated that unit prices were controlling. However, on its face, the amount of Rudzik's Base Bid 1, $1,260,000, was obviously not the product of $16 x 50,000, which equals $800,000. The District's assertion that this contract was not ambiguous is belied by the face sheet of the bid. The math simply did not add up to the District's version of a unit price contract. Thus, the District accepted the bid knowing it did not comply with the unit-price formula in the Bid Proposal Form, militating against a unit-price interpretation.

**{¶41}** Further, the Bid Form had no place to insert a unit price for the sand placement or road work, which, according to Addendum 1, were also part of Base Bid 1. This omission in the Bid Form could reasonably be interpreted to indicate the costs of

12

this work were to be added to the costs of sludge removal, supporting a fixed-price interpretation.

{¶42} Moreover, the two Addenda instructed bidders to add all necessary costs to arrive at Base Bid 1 and Alternate Bid 2. Addendum 1 instructed bidders to include whatever was necessary for the contractor to complete that portion of the work in the bid, which, as to Base Bid 1, included sludge removal, sand placement, and road repair. The Chief Engineer testified this Addendum instructed bidders to add up their cost for labor, materials, insurance, overhead, and profit to arrive at their total cost. He said their total bid amount was to be the total of their costs for completing the work. The foregoing further supported a fixed-price interpretation.

{¶43} Specifically, Addendum 1 advised bidders that, as to Base Bid 1, their bid amount should be the total of the following costs: the cost of removing 50,000 cubic yards of sludge from Lagoon G; the cost of placing six inches of sand in that lagoon; the cost of labor, equipment, and materials; the cost to dig out low pothole areas and fill them with six inches of limestone and to lay three inches of limestone on the whole roadway; and the cost of roadway repairs from Salt Springs Road to the lagoons.

{¶44} In addition, Addendum 2 explained that for Base Bid 1 and Alternative Bid 2, bidders should make sure "the top line and dollar figure" included their total cost for that part of the work.

{¶45} Further, the Addenda provided for credits to the District for work not performed or materials not used, which, again, signaled a fixed-price contract. Addendum 1 provided that any unused items in the contract would be a credit to the District. Addendum 2 provided that, as to Alternate Bid 2, the "second line per cubic

13

yard" should be the cost of the sand delivered to the lagoon per cubic yard, so that the District would receive a credit for sand it provided for the project. It is worth noting the District does not dispute Rudzik's argument that unit-price contracts do not provide for credits, while fixed-price contracts do. Rudzik argues that credits may be necessary with fixed-price contracts to reduce the agreed price for work that is removed from the project, but credits are not necessary with unit-price contracts because the contractor is only paid as units are completed.

**{¶46}** Finally, Rudzik's breakdown, *which the District approved*, also indicated a fixed-price contract. After the District received Rudzik's bid, the District, in an e-mail, dated January 14, 2015, at 9:26 a.m., asked Rudzik for a breakdown of its bid. Rudzik responded later that same date with the following detail:

| Base Bid 1 | ITEM DESCRIPTION | QTY | UNIT | UNIT PRICE TOTAL | TOTAL AMOUNT |
|---|---|---|---|---|---|
| | Mob/Demob, Bond, Survey Etc. | 1 | LS | $ 30,500.00 | $ 30,500.00 |
| | Removal of Lime Sludge | 50,000 | CY | $ 18.10 | $ 905,000.00 |
| | Installation of Silica Sand @ Lagoon G | 5,647 | CY | $ 49.93 | $ 281,954.71 |
| | MVSD Drive Repair & Upgrade | 1 | LS | $ 42,545.29 | $ 42,545.29 |
| *Lime Sludge Credit of $16/CY | | | | Base Bid Total | $ 1,260,000.00 |

**{¶47}** Thus, Rudzik's breakdown for Base Bid 1 showed the total cost of that bid ($1,260,000) was comprised of *the cost of sludge removal, sand placement, and road repairs*.

**{¶48}** One week later, after receiving this clarification, the contract was awarded to Rudzik. In reality, the effect of this correspondence was to remove any ambiguity whatsoever about the nature of Rudzik's bid. It is difficult to understand why the District continues to assert this was simply a unit-price contract in the face of this detailed breakdown.

14

{¶49} The District concedes that "Base Bid 1 of Addendum 1" is arguably ambiguous, but argues the trial court should have interpreted that ambiguity in light of other contract documents indicating this was a unit-price contract. In other words, the District argues the court should have ignored this ambiguity in ruling on its motion for directed verdict. However, the Addenda were issued by the Chief Engineer in order to explain the other contract documents and were at least as important as the other parts of the contract.

{¶50} When considering the contract documents as a whole, including the two Addenda, it is unclear whether the parties intended the contract to be a unit-price or fixed-price contract. As a result, the contract was ambiguous, and the trial court did not err in finding that a question of fact existed as to the parties' intent and in denying the District's motion for directed verdict.

{¶51} For its second issue under this assigned error, the District argues the trial court erred in allowing the jury to determine the amount of Rudzik's damages because, according to the contract documents, the District's hired surveyor was to determine the amount of sludge removed, which, in turn, would determine the final contract price.

{¶52} However, according to the contract, "[a]ll work necessary for removing the lime sludge * * * shall be done to the satisfaction of the [Chief] Engineer, who shall * * * determine the amount of the sludge which is to be paid for hereunder, and shall decide all questions which may arise as to measurement of quantities * * * and his * * * decision shall be a condition precedent to the right of the Contractor to receive any money hereunder."

**{¶53}** "Contract clauses which make the duty of performance of one of the parties conditional upon his satisfaction are referred to as 'satisfaction clauses.'" *Hutton v. Monograms Plus, Inc.*, 78 Ohio App.3d 176, 181 (2d Dist.1992). Where the satisfaction clause requires satisfaction as to such matters as commercial value or quality, rather than personal taste, dissatisfaction cannot be claimed unreasonably. *Id.* "In these contracts, an objective standard is applied to the satisfaction clause and the test is whether the performance would satisfy a reasonable person." *Id.*

**{¶54}** Construing the evidence in favor of Rudzik, the trial court did not err in denying the District's motion for directed verdict because an issue of fact was created as to whether the Engineer's determination was objectively reasonable.

**{¶55}** The District's surveyor estimated that only 22,630 cubic yards had been removed, in contrast to the 47,500 cubic yards calculated by Rudzik's subcontractor, C. Crump & Associates. The District's surveyor testified his calculation was based on two surveys, one before the sludge was removed, and, the other, afterwards. He took the data from those surveys and used an Auto CAD program to estimate the volume of sludge removed. However, he admitted there were flaws with this method, which undermined the reliability of his estimate. He admitted that Auto CAD surveys are "not always accepted" for field survey work, such as was involved here. Further, he did not participate or even attend either the before or after survey; instead, the surveys were performed by assistants. Further, he admitted these assistants used benchmarks that were ten years old and were taken from another lagoon. Also, for the before survey, the assistants did not enter the lagoon, and, thus, they did not determine the depth of the water in the lagoon or the density of the sludge.

16

{¶56} In contrast, C. Crump & Associates, Rudzik's subcontractor, used daily tickets and truck counts to determine the amount of lime sludge they removed. Crump tracked the quantities by counting cubic yards of sludge for each bucket. They then counted the number of buckets used to fill each truck and then counted and weighed the loaded trucks. When the lagoon was half empty, Crump's records showed they had removed 25,040 cubic yards of sludge. They subsequently removed another 22,460 cubic yards from the lagoon.

{¶57} In light of the issues raised concerning the reliability of the District's survey, the trial court did not err in finding that a question of fact existed concerning whether it was objectively reasonable for the Engineer to determine, based on the estimate of the District's hired surveyor, that only 22,630 yards of sludge had been removed. Contrary to the District's argument, the issue here was not whether the contract provision regarding the surveyor was clear and ambiguous; rather, the issue was whether the Engineer's determination was objectively reasonable. Further, since the jury obviously found the District's surveyor was not credible (as noted by the trial court in its entry denying the District a new trial), the jury was entitled to rely on Crump's calculations regarding the amount of sludge his employees removed. For this additional reason, the court did not err in denying the District's motion for directed verdict.

{¶58} For its second and last assignment of error, the District alleges:

{¶59} "The trial court abused its discretion by admitting Rudzik's Exhibits 29, 30, and 31."

{¶60} We review a trial court's decision to admit or exclude evidence for an abuse of discretion, and we will not disturb the trial court's ruling without a clear showing

17

that the court abused its discretion in a manner that materially prejudices a party. *Capital One Bank (USA) NA v. Reese*, 11th Dist. Portage No. 2014-P-0034, 2015-Ohio-4023, ¶95. The term "abuse of discretion" is one of art, connoting judgment exercised by a court, which does not comport with reason or the record. *Id.* This court has stated: "'a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *State v. Dyer*, 11th Dist. Lake No. 2015-L-121, 2017-Ohio-426, ¶40, quoting *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991).

{¶61} Evid.R. 1006 provides: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."

{¶62} Mr. Tressa testified regarding two categories of damages sustained by Rudzik: (1) the balance owed for work completed by Rudzik for which the District refused to pay; and (2) lost profits. Mr. Tressa testified that he prepared these exhibits and that each contained calculations based on summaries of testimony and other exhibits in evidence. He said that Exhibit 29 calculated the amount owed for unpaid work based on Crump's testimony that 47,500 cubic yards of lime sludge had been removed from Lagoon G. Alternatively, Exhibit 30 calculated the amount owed for unpaid work based on the District's claim that only 22,630 cubic yards of lime sludge had been removed. At trial, Rudzik offered pay applications, invoices, and other exhibits that documented what payments were made and what credits were warranted. Exhibits 29 and 30 summarized and calculated the amounts shown in those records. Exhibit 31 showed Rudzik's calculation of lost profit incurred due to the District's refusal

18

to allow Rudzik to complete the remainder of Base Bid 1. The lost profit was calculated based on the average profit Rudzik's accountant reported for all jobs Rudzik performed in 2015. Rudzik's project manager, bookkeeper, and accountant verified the process by which the calculations were made.

{¶63} The District does not dispute that Exhibits 29, 30, and 31 were based on testimony and exhibits in evidence and that they were summaries of that evidence.

{¶64} This court considered similar exhibits in *Avery Dennison Corp. v. Con-Way Transp. Serv., Inc.*, 11th Dist. Lake No. 2005-L-218, 2006-Ohio-6106. In that case, the plaintiff offered two separate damages summaries, one based on Avery's calculations and one based on Con-Way's. *Id.* at ¶51. This court held that these alternate calculations were admissible pursuant to Evid.R. 1006 and that the trial court did not abuse its discretion in admitting the exhibits. *Id.* at ¶53.

{¶65} Because the subject exhibits were summaries of testimony and numerous exhibits in evidence, which could not conveniently be examined in court while Mr. Tressa and Rudzik's bookkeeper and accountant were testifying, the trial court did not abuse its discretion in admitting them.

{¶66} For the reasons stated in this opinion, the assignments of error are overruled. It is the order and judgment of this court that the judgment of the Trumbull County Court of Common Pleas is affirmed.

DIANE V. GRENDELL, J.,

TIMOTHY P. CANNON, J.,

concur.

19