[Cite as *Brownfield Restoration Group, L.L.C. v. Trickett*, 2018-Ohio-4473.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**PORTAGE COUNTY, OHIO**

| | | |
|---|---|---|
| BROWNFIELD RESTORATION GROUP, LLC, | : | **O P I N I O N** |
| | : | |
| Plaintiff-Appellee, | : | **CASE NO. 2018-P-0025** |
| | : | |
| - vs - | : | |
| | : | |
| HOWARD J. TRICKETT, | : | |
| Defendant/Third Party Plaintiff-Appellant, | : | |
| | : | |
| - vs - | : | |
| | : | |
| JIM SMITH, | : | |
| Third Party Defendant-Appellee. | : | |
| | : | |

Civil Appeal from the Portage County Court of Common Pleas, Case No. 2015 CV 00286.

Judgment: Affirmed.

*Daniel J. Rudary*, Brennan, Manna & Diamond, LLC, 75 East Market Street, Akron, OH 44308 (For Plaintiff-Appellee, Brownfield Restoration Group, LLC and for Third Party Defendant-Appellee, Jim Smith).

*Jon A. Troyer*, Jon A. Troyer, Attorney at Law, LLC, 1953 Gulf Street, N.W., Uniontown, OH 44685 (For Defendant/Third Party Plaintiff-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant/third party plaintiff-appellant, Howard J. Trickett, appeals from

the judgment of the Portage County Court of Common Pleas, granting judgment in favor

of plaintiff-appellee, Brownfield Restoration Group (BRG), on its claim for Breach of Contract, and dismissing his counterclaim for Fraudulent Inducement. The issues to be determined by this court are whether a trial court errs in finding a Breach of Contract when a party fails to supply documentation necessary for the opposing party to complete its obligations and whether it is Fraudulent Inducement for a contract to include potentially conflicting terminology regarding the services to be provided when such services are fully described within the contract. For the following reasons, we affirm the decision of the lower court.

{¶2} On October 8, 2013, BRG, a company that performs environmental site assessments and property restoration services, filed a Complaint against Trickett in the Portage County Municipal Court, Ravenna Division, for Breach of Contract. The Complaint alleged that BRG had entered a contract with Trickett to perform actions assessing property owned by Trickett's corporation and apply for state funding but that Trickett instructed BRG not to proceed and refused to make payment. BRG sought damages of $5,500 for the portion of the contract already completed.

{¶3} Trickett filed an Amended Answer on February 19, 2015, asserting, inter alia, the defense of breach of contract by BRG. He filed a Second Amended Answer with Counterclaim and Third-Party Complaint on March 30, 2015. In the Counterclaim/Third-Party Complaint, he alleged that BRG and third-party defendant-appellee, Jim Smith, the owner of BRG, committed Fraudulent Inducement, asserting he was misled about whether BRG would seek and receive funding to clean up his property.

{¶4} An Order Granting Motion to Transfer was filed on March 31, 2015, transferring the case to the Portage County Court of Common Pleas.

2

{¶5} BRG and Smith filed a Reply to the Counterclaim and Answer of Third-Party Defendant on May 11, 2015. BRG filed a First Amended Complaint on August 17, 2015. BRG and Smith subsequently filed a Motion for Summary Judgment, which was denied by the trial court.

{¶6} A trial was held before a magistrate on December 14-15, 2016. The following pertinent testimony and evidence were presented:

{¶7} Jim Smith is the owner of Brownfield Restoration Group, which focuses on the revitalization of "brownfield" properties, which are typically commercial properties contaminated from past use. According to Smith, the assessment and cleanup of such properties is often funded by a State of Ohio program called "Clean Ohio," which transitioned into a program called "Jobs Ohio," around 2013 to 2014.

{¶8} Smith described the process of funding and completing a cleanup under this program. According to Smith, and consistent with the presentation of Clean Ohio documents, the first step in the process of receiving funding for a brownfield property cleanup is completing Phase I, which involves performing historical research and site inspection of the property. BRG typically charges the applicant/property owner approximately $5,000-6,000 for a Phase I assessment. After Phase I is completed, an entity could apply to Clean Ohio for funding for a Phase II assessment, which is more costly, extensive and involves sampling of soil, ground water, and vapor. Information obtained in Phase II is used to complete a Clean Ohio application for cleanup funding.

{¶9} In 2012, Smith and BRG began working with Trickett, who he understood to be interested in running a pallet manufacturing facility on a Portage County brownfield property, a former rubber manufacturing facility in "complete disrepair."

{¶10} Smith testified that BRG had entered a contract with Trickett requiring

3

BRG to perform a Phase I assessment and assist in seeking Clean Ohio funding for the Phase II assessment. He argued that there was no intent to enter into a contract for the cleanup phase, although BRG would have been willing to proceed with cleanup assistance in a subsequent agreement.

{¶11} The proposal, incorporated into the contract executed by Trickett on October 24, 2012, provided, in pertinent part:

> Brownfield Restoration Group, LLC (BRG) has prepared this proposal to perform a Voluntary Action Program (VAP) Phase I Property Assessment and prepare an application for Clean Ohio funding for remediation of the above referenced property. * * * The specific scope of work that is the basis of this proposal is provided in the following summaries.

{¶12} Following this provision was a list of five tasks. Tasks 1 through 4 provided for: "oversight of the Phase I assessment work * * * to facilitate preparation of the Clean Ohio application"; a review of background records and databases "to develop a comprehensive environmental history of the property usage as part of the Phase I Property Assessment process"; a "Phase I Site Inspection" to document the condition of the site; and preparation of a "Phase I Property Assessment report." Finally, Task 5 provided for "Clean Ohio Application Preparation":

> This task will entail working with the County and Mr. Trickett to compile the pre-requisite SABR (Site Assessment and Brownfield Revitalization) application and the grant application. BRG will be responsible for the environmental portions of the Clean Ohio application and rely on Mr. Trickett and the County for other required documentation (e.g., resolutions, tax disclosure forms, etc.).

{¶13} Smith testified that, as of the date the contract was signed by Trickett in October 2012, Portage County was eligible for Clean Ohio funding pursuant to a map published by the State of Ohio, although Portage County was removed from that

4

funding in January 2013.

{¶14} Following the execution of the contract, BRG assisted in drafting a letter of interest to Clean Ohio from Portage County on October 29, 2012, explaining that Trickett was seeking to create a facility for his company, Enviropak, which produces and sells plastic pallets. This letter was signed by Todd Peetz, the director of the Portage County Regional Planning Commission, as county involvement is necessary to receive Clean Ohio funding. In December 2012, Smith was in e-mail communication with personnel from Clean Ohio regarding the proposed project.

{¶15} The Phase I assessment, which compiled various documents relating to the history and physical state of the property, was completed in January 2013 and was "three to four inches thick." Following that assessment, a scope of services and cost estimate to complete the Phase II Assessment was also completed, which summarized the work to be done in Phase II. Smith testified that the Phase II assessment may cost around $250,000.

{¶16} Pursuant to Smith, a meeting was held on January 18, 2013, including Peetz, Trickett, and representatives from Clean Ohio. At that meeting, Trickett stated for the first time that he wanted to make the site a rail depot. According to Smith, a Clean Ohio representative, Patricia Beard, stated that she would need a business plan in order to consider any cleanup funding for the railroad project. Around the time of this meeting, Smith saw that Portage County was no longer on the map for counties eligible for funding under Clean Ohio. Smith did not believe this would stop the project as there were other ways to seek funding.

{¶17} Smith testified that, after the meeting, he followed up with Trickett on multiple occasions about the business plan, which Trickett had not completed. On

5

February 2, 2013, Trickett was sent an invoice of $5,500 for the Phase I assessment. This invoice was not paid and, by the summer of 2013, Trickett was no longer returning phone calls, leading to the filing of the suit in October 2013.

{¶18} Smith testified that BRG sued for $5,500, the amount of compensation to be received for Phase I under the contract, since BRG completed Tasks 1 through 4. Task 5 was not completed by BRG because Trickett failed to provide a business plan for submission to Clean Ohio regarding use of the property as a rail depot. Regarding Trickett's assertion that the contract provided for the entirety of the cleanup rather than just assessments since it included the word "remediation," Smith testified the contract should have more properly provided for an "application for Clean Ohio funding for Phase II Assessment." He testified that remediation is a "vague" term, is sometimes used interchangeably with cleanup, and is used as a "catchall" term. He explained that "remediation is sometimes loosely used to refer to the whole process."

{¶19} Howard Trickett, the owner of Enviropak, which manufactures plastic pallets, purchased the subject brownfield property through a limited liability company. He expressed that he was aware the process of remediating/cleaning the property would involve several steps and contracted with BRG to assist in this process. Trickett stated that he was given assurances at meetings prior to the signing of the contract that he would get the money to clean up the property. He believed the contract was to obtain the cleanup grant for the property.

{¶20} Trickett testified that he met with a railroad representative near the end of 2012 and decided that he wanted to create a railroad depot in addition to a manufacturing facility on the property. At the January 2013 meeting, he and the railroad representative advised the Clean Ohio representatives of the railroad project.

6

{¶21} Trickett testified that Smith told him at that meeting that the project was "dead" because Portage County was no longer on the map for funding, although he admitted this was the opposite of what he said in his deposition testimony. He testified that Smith never told him he needed a business plan and did not inquire about his completion of such plan.

{¶22} Trickett testified that after the meeting, he received a Phase I assessment and an invoice for the assessment. Although Smith tried to contact him, Trickett stated that he did not call back because he "lost all respect for Mr. Smith by that stage." He believed Smith had not completed all of the work as required in the contract and was upset because he had not been informed prior to the January 2013 meeting that Portage County was no longer on the map for Clean Ohio funding. He stated that Smith never informed him that Portage was an "iffy county" as far as funding availability.

{¶23} On July 19, 2017, a Magistrate's Decision was issued, in which the following pertinent factual findings were made: Trickett was aware that the process to apply for Clean Ohio funding was a multi-step process; Trickett "frustrated the application process and the contract by changing the intended use of the Property mid-application process"; Trickett failed to provide a business plan although he was aware one was necessary to proceed with the funding process; Trickett refused to pay for the Phase I property assessment; and BRG could not complete the contract "due to Trickett's failure to provide all necessary documentation." The magistrate rejected Trickett's claim that BRG and Smith fraudulently misrepresented themselves by deceiving him on the services to be provided by including the word "remediation," finding that there was no knowing misrepresentation and no loss was suffered. The Magistrate's Decision terminated the contract, awarded damages in the amount of

7

$5,500, and ruled in favor of BRG and Smith on the Counterclaim/Third-Party Complaint. On the same date, the trial court issued a Judgment Entry adopting the Decision.

**{¶24}** BRG filed a Motion for Attorney's Fees on July 27, 2017.

**{¶25}** Trickett filed Objections to Magistrate's Decision on August 7, 2017, which were opposed by BRG.

**{¶26}** The trial court issued a Judgment Entry on February 26, 2018, overruling the Objections to Magistrate's Decision and adopting said Decision. The court awarded BRG attorney's fees in the amount of $60,482.50.

**{¶27}** Trickett timely appeals and raises the following assignments of error:

**{¶28}** "[1.] The trial court erred when it failed to give the contract words used by the parties their commonly accepted meaning.

**{¶29}** "[2.] The trial court erred by using parole evidence to change the terms of the contract."

**{¶30}** In his first assignment of error, Trickett raises several arguments.[1] Primarily, he contends that the lower court erred in its determination that the contract between himself and BRG covered only the initial assessment phases of the property remediation process rather than the funding for and final cleanup of the property.

---

1. We note that the appellees, rather than directly addressing the issues raised by appellant, which they argue "fail to assign error to any judgment or decision of the trial court," provide an overall analysis of whether each element was met for the Breach of Contract claim and the Fraudulent Inducement counterclaim. We will address only the specific arguments assigned by appellant. *See Tally v. Patrick*, 11th Dist. Trumbull No. 2008-T-0072, 2009-Ohio-1831, ¶ 22 (this court will only address arguments raised by an appellant in support of his or her assignments of error and will not "root * * * out" arguments on his or her behalf) (citation omitted). It also must be emphasized that although appellant contends in his reply brief that "the granting of [attorney's] fees was in error," no assignment of error nor argument was raised in relation to attorney's fees in appellant's initial brief. "An appellant may not use a reply brief to raise new issues or assignments of error." (Citation omitted.) *Oko v. Lake Erie Corr. Inst.*, 11th Dist. Ashtabula No. 2010-A-0002, 2010-Ohio-2821, ¶ 15, fn. 1.

Specifically, he argues that the contract language was unambiguous and, thus, the court should not have looked to other evidence outside of the contract.

{¶31} "When reviewing an appeal from a trial court's decision to accept or reject a magistrate's decision," this court has consistently held that "an appellate court must determine whether the trial court abused its discretion." *Dudas v. Harmon*, 11th Dist. Lake No. 2015-L-060, 2015-Ohio-5218, ¶ 44; *Wolkoff v. Bloom Bros. Supply, Inc.*, 11th Dist. Geauga No. 2012-G-3092, 2013-Ohio-2403, ¶ 32. This standard has been applied in breach of contract cases. *Coliadis v. Holko Enercon, Inc.*, 2016-Ohio-8522, 78 N.E.3d 1257, ¶ 18 (11th Dist.).

{¶32} "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. "Contract language is ambiguous if it is susceptible to two or more reasonable interpretations." (Citation omitted.) *Rudzik Excavating, Inc. v. Mahoning Valley Sanitary Dist.*, 2017-Ohio-8630, 101 N.E.3d 38, ¶ 37 (11th Dist.) Where a contract is ambiguous a court may consider extrinsic evidence to ascertain the parties' intent. *Westfield* at ¶ 12.

{¶33} We initially question the relevance of Trickett's argument that the court applied parol evidence in interpreting the terms of the contract in light of the facts of this case. Trickett argues extensively in his brief that the trial court could not use evidence outside of the contract to interpret the word "remediation" and to decide whether it included a requirement to seek funding for a cleanup or only to provide certain assessment services as steps toward a subsequent cleanup. The magistrate's decision, however, found the breach of contract based on Trickett's failure to complete necessary steps to proceed with the contract. In reaching the determination that

9

Trickett's breach of the contract necessitated its termination and an award in favor of BRG, it made no factual or legal findings about the use of the term "remediation" in the contract and what its meaning was. Thus, we do not find any issue as to the court stepping outside of the language of the contract to interpret what the parties agreed on this issue.

{¶34} The trial court, however, did address the issue of "remediation" as a contract term in relation to Trickett's Fraudulent Inducement counterclaim and contention that misrepresentations were made to him that BRG would submit an application for "remediation" funding, while Smith and BRG truly only intended to submit an application for "assessment" funding. We note, however, that "the parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement." *Galmish v. Cicchini*, 90 Ohio St.3d 22, 28, 734 N.E.2d 782 (2000).

{¶35} Thus, to the extent that Trickett argues that the inclusion of the word "remediation" in the contract was used as part of a process to fraudulently induce him into signing a contract which led him to believe BRG would be applying for cleanup money, we will address the issue of the court's interpretation of the language of the contract, keeping in mind that it was permitted to consider extrinsic evidence which was extensively presented by the parties at trial.

{¶36} The elements of Fraudulent Inducement are: "(1) a representation or, when there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that such knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) with justifiable reliance on the

misrepresentation or concealment, and (6) an injury proximately caused by that reliance." *Doctor v. Marucci*, 11th Dist. Lake No. 2013-L-056, 2013-Ohio-5831, ¶ 11.

{¶37} The language of the proposal, incorporated as part of the signed contract, stated that the proposal was "to perform a Voluntary Action (VAP) Phase I Property Assessment and prepare an application for Clean Ohio funding for remediation of the above referenced property." It further explains, in Tasks 1 through 4, that Phase I assessment work would be done. There is no question that this work was indeed completed by BRG. Task 5 states that BRG would work with the county and Trickett to compile a "site assessment and brownfield revitalization" application and grant application. Trickett contends that the use of the phrase "application for Clean Ohio funding for remediation" meant that BRG would apply for funding for the final cleanup rather than for the Phase II assessment. This argument is based on his assertion that "remediation" is the same as "cleanup." The lower court concluded that there was no purposeful misrepresentation, emphasizing that remediation is "an act or process of remedying" and that the contract proposal did not contain the term "cleanup."

{¶38} Based on a review of the record, we cannot find that the inclusion of the term "remediation" was fraudulent, or made with the intent to induce reliance. Smith testified extensively that he explained to Trickett the contract would only be to complete the initial Phase I work as well as apply for Phase II assessment funding and that cleanup was not part of the contract. He also testified that after work commenced, Trickett never questioned why a cleanup had not occurred or why assessments were being performed. Smith admitted that use of the word "remediation" was inartful but also testified that this word can be used to refer to the entire process in general and not merely the final result. The additional language of the contract proposal also supports

11

the conclusion that there was no intent to induce reliance that an application for cleanup funding or final cleanup would be completed. Four of the five steps in the proposal relate solely to the Phase I assessment, which clearly state that only inspections, research, and a report will be prepared. The final step requires BRG to work on a "site assessment" application and grant application. None of the tasks reference applying for cleanup funds.

{¶39} Trickett raises several specific arguments in support of his overall contention that Smith and BRG used the word "remediation" to mean cleanup. First, he references Smith's testimony where he uses cleanup and remediation interchangeably. However, this is consistent with Smith's testimony that the term remediation may be used to reference the general process of assessing and cleaning the property. Further, while Trickett points to the fact that Peetz testified there was an overall goal to fund a final cleanup, this was based on his perspective as the director of the Portage County Regional Planning Commission, not from any knowledge of what was included in the contract executed by BRG and Trickett. Smith himself testified on several occasions that there was an ultimate goal of seeking cleanup funding and seeing the project through to the end. However, he also noted that BRG would not contract for items such as the Phase II assessment completion and funding of the final cleanup, as such funds would be provided through Clean Ohio to the local government entity (in this case, Portage County).

{¶40} Trickett also takes issue with e-mail communications from Smith to him which stated that "Clean Ohio will expect that any site for which they accept a letter of interest will have the required environmental assessment work completed before they begin processing a grant application." He contends that this sentence implies that a

12

"grant" would be for cleanup. Smith explained, however, that he informed Trickett this reference was for the Phase II assessment funds. While Trickett disputes this contention, this was an issue for the finder of fact and we must give deference to its finding as to whether the witness testimony was credible and convincing. *Coliadis*, 2016-Ohio-8522, 78 N.E.3d 1257, at ¶ 26, citing *Iacovone v. Selvaggio,* 11th Dist. Lake No. 2014-L-090, 2015-Ohio-1493, ¶ 12. Further, this fails to take into account, as referenced above, that Smith was clear BRG did intend and hoped to continue through the process of seeking multiple grants, both for a Phase II assessment and a cleanup, although the latter was not part of the initial contract. It is logical that BRG wanted to provide advice and assistance in reaching the final goal, as it would receive the most profits from the final cleanup stage (pursuant to Smith's testimony) but that it did not commit to a contract for those steps until it was clear that funding would be received.

{¶41} Trickett argues that the term remediation is used synonymously with "cleanup" in various statutes and case law, supporting the contention that this was the meaning the parties intended. *See* R.C. 122.65. As outlined above, when looking at the entire context of the contract, including its title ("Standard Agreement for Phase I and Application Environmental Site Assessment Services") and description of the assessment process, as well as the circumstances, there was no false statement made "with the intent of misleading another into relying upon it" utilized to deceive or trick him into signing the contract. *Doctor*, 2013-Ohio-5831, at ¶ 11. Rather, at worst, there was either a misunderstanding or the failure to use a particular term that may have been clearer.

{¶42} Finally, Trickett takes issue with the lower court's finding that he did not rely on the representations made by Smith, as he contends he relied on e-mail

13

communications and the written contract to determine that he was contracting for an entire cleanup. However, there was contradictory testimony from Smith, who stated that he explained the contract would be for assessment rather than cleanup. The fact that Trickett testified he believed otherwise was again a matter for the finder of fact to decide.

{¶43} The first assignment of error is without merit.

{¶44} Trickett assigns as his second error that the lower court erred by using parol evidence to change the terms of the contract. The substance of his argument, however, is that the court erred in finding that he, rather than BRG, breached the contract.

{¶45} The lower court concluded that Trickett breached by preventing BRG from completing the terms of the contract due to failure to provide a business plan. Trickett argues that this was not a breach since such plan was unnecessary to proceed with seeking cleanup funding and the contract did not require the submission of such a plan. We disagree.

{¶46} The breach at issue relates to Task 5 of the proposal, which provides: "BRG will be responsible for the environmental portions of the Clean Ohio application and rely on Mr. Trickett and the County for other required documentation (e.g., resolutions, tax disclosure forms, etc.)." Smith testified that Trickett was made aware at the January 2013 meeting by Clean Ohio employee Patricia Beard that it was necessary to submit a business plan to support his rail depot project or the request for funding the Phase II assessment could not proceed. Smith testified that he called Trickett on "a couple of occasions" following that meeting to inquire about whether the business plan had been completed but the plan was never finished. According to Smith, completion of

14

the final task, applying for funding for Phase II from Clean Ohio, was impossible without Trickett's cooperation, especially given that Beard made clear that without the business plan Clean Ohio was "not interested in funding Phase II or cleanup or anything else."

{¶47} The contract does not specifically state which items Trickett must provide to BRG, but sets forth that submission of "other required documentation" would be necessary, providing a non-exhaustive list of examples following "e.g." *See In re Hartman*, 2 Ohio St.3d 154, 156, 443 N.E.2d 516 (1983) (using a word such as "including" indicates that the list of items is partial and non-exhaustive and is used as merely an illustration). Smith correctly contends that the business plan was among the types of documents necessary to move forward with the step of applying for Phase II assessment funding. The business plan document is consistent with the type that would be expected under the contract, as Trickett was to provide necessary information that was within his control. BRG could not be responsible for completing a business plan since Trickett was the one developing the business and determined the use of the property.

{¶48} A party is not required to perform under a contract if the opposing party has rendered doing so impossible. *See Fed. Deposit Ins. Corp. v. Traversari*, 11th Dist. Geauga No. 2008-G-2859, 2010-Ohio-2406, ¶ 22; *Fabrication Group L.L.C. v. Willowick Partners L.L.C.*, 11th Dist. Lake No. 2011-L-141, 2012-Ohio-4460, ¶ 45. Trickett's refusal to supply a required document is sufficient to find that he was in breach since a party who has been prevented from performing "may disregard the contract and sue for the reasonable value of what he has performed." *Cleveland Co. v. Standard Amusement Co.*, 103 Ohio St. 382, 133 N.E. 615 (1921), syllabus.

{¶49} Trickett takes issue with the use of Beard's statements to support a

15

conclusion that Clean Ohio required a business plan to proceed, arguing they were improper hearsay. Several of Beard's statements were referenced during Smith's testimony. Trickett's counsel objected to a statement from Smith in relation to Beard being "taken aback" about the railway depot plan and the objection was sustained. Subsequently, during Smith's testimony about the conclusion of the meeting, he testified that Beard stated that "the rail depot idea was interesting, but would need a business plan in order for them to further consider any funding for the project." Trickett's counsel registered no objection to this testimony. Failure to object to the admission of hearsay statements has been found to waive such error on appeal, especially where there are no "exceptional circumstances, but rather a typical failure to object to typically disputed evidentiary materials." *Russi v. Brentlinger Ents.*, 10th Dist. Franklin No. 10AP-1143, 2011-Ohio-4764, ¶ 23-24 (where there was no error that "seriously affects the basic fairness, integrity or public reputation of the judicial process," the failure to object to the hearsay at trial forfeited that argument on appeal); *Geauga Metro. Housing Auth. v. Biggs*, 11th Dist. Geauga No. 98-G-2207, 2000 WL 665567, * 3 (May 19, 2000) (finding it unnecessary to consider a hearsay issue when it was not objected to at the trial court level). Moreover, even in the absence of Beard's specific statements, Smith's testimony that he was aware Clean Ohio would not approve the application for funding without a business plan and thus informed Trickett of this fact still weighs in favor of finding a breach.

{¶50} Trickett's contention that he was never informed of the need to complete a business plan also lacks merit. Although Trickett initially denied at trial being told he needed to complete a plan, he stated that his recollection was refreshed when confronted with deposition testimony to the contrary. Smith testified that the need for a

16

business plan was clearly stated at the January 2013 meeting and he followed up with Trickett multiple times. Again, this credibility determination is best left to the trier of fact.

{¶51} Trickett also contends that the business plan requirement was a pretext for BRG's failure to fulfill its obligation to clean up the property, either because it did not believe it was required to do so under the contract or because funding was no longer available. This does not address Smith's testimony that a business plan was required by Beard to proceed to the next step. Even if BRG did not intend to fulfill its contractual obligations, which Trickett has not proven, this does not refute the argument that Phase II funding must be sought prior to proceeding to additional work.

{¶52} Trickett also argues that, even assuming a business plan was necessary, BRG failed to provide him a reasonable time period to complete and submit such a document. There is nothing in the contract or testimony showing what amount of time the parties believed it would take to collect materials to apply for assessment funding. Generally, a "reasonable time" is implied if not otherwise stated and "is to be determined from the surrounding conditions and circumstances that the parties contemplated at the time the contract was executed." *Miller v. Bealer*, 80 Ohio App.3d 180, 182, 608 N.E.2d 1133 (9th Dist.1992). However, it was evident from Trickett's testimony that he had no intention of completing the plan, stating that he would not continue to speak to Smith or BRG, which was corroborated by Smith's testimony that he no longer received responses from Trickett by the summer of 2013, several months prior to filing suit in October. Based on the circumstances of the present matter, we find no ground to hold that Trickett would have completed the business plan within a reasonable time.

{¶53} Finally, Trickett raises arguments relating to the invoice. While it was argued that the contract was breached because Trickett failed to pay the $5,500 invoice

17

for Tasks 1 through 4, he argues it was unnecessary to make payment until completion of the entire project, since the contract provided that he shall pay "for services rendered pursuant to the proposal a lump sum fee in the amount of $10,500." Presuming that it was not a breach to fail to pay the initial invoice, as noted above, the court had other grounds to find Trickett breached the contract.

{¶54} The court's $5,500 award of damages was only for the work that was unquestionably completed under Tasks 1 through 4, relating to Phase I. The proposal provides that the estimated cost of the Phase I Assessment was $5,500. Since Trickett was in breach, which prevented full performance, it was proper for BRG to seek "the reasonable value of what [it] has performed." *Standard Amusement Co.*, 103 Ohio St. 382, 133 N.E. 615, at syllabus. The cost of the services as provided in the contract is certainly a reasonable value of what was performed.

{¶55} The second assignment of error is without merit.

{¶56} For the foregoing reasons, the judgment of the Portage County Court of Common Pleas is affirmed. Costs to be taxed against appellant.

THOMAS R. WRIGHT, P.J., concurs,

COLLEEN MARY O'TOOLE, J., concurs in judgment only.